ROBERTS *v*. MICHIGAN TRUST CO.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—PLEADING—TRUSTS.
   In suit against trustees for unlawful diversion of funds, question which arose as to valuation of certain investments in the estate of which no complaint was made in bill of complaint will not be considered on appeal.

2. CORPORATIONS—VALUE OF STOCK—EXECUTORS AND ADMINISTRATORS—TRUSTEES.
   Valuation of stock at market price as established by a sale thereof for determination of executors' commission upon transfer of stock from executors to trustees *held*, proper in suit against them for alleged unlawful diversion of funds.

3. TRUSTS—ACCOUNTS—PUBLICATION OF NOTICE.
   Omnibus order of probate court directing notice by publication of several accounts by the same trustees as to different trusts specifically mentioned in the order which arose out of the same estate *held*, proper and sufficient notice to contingent beneficiaries (3 Comp. Laws 1929, §§ 15538, 15880).

4. SAME—CONTINGENT REMAINDERMEN—PRESERVATION OF CORPUS.
   Contingent remaindermen of corpus of spendthrift trust estate who take in default of appointment of holder of a life interest and upon their survival of him *held*, to have sufficient interest therein to be entitled to file bill against trustees to restore alleged unlawfully diverted funds and enforce proper execution of trust since they are not forced to sit by and see corpus of estate wasted away or destroyed through illegal or improper investments.

5. SAME—PROTECTION OF EXISTING INTERESTS IN ESTATE.
   Generally, a *cestui que trust* who can allege an existing interest, however minute or remote, may, upon reasonable cause being shown, apply to the court to have his interest properly secured.

6. Same—Settlement of Account—Res Judicata.

Settlement of account of a trustee by the probate court involves an adjudication upon each item and has the effect of a judgment in a court of record and when determination is made the account is settled on both sides, is *res judicata* of the matters therein disposed of and cannot be attacked collaterally (3 Comp. Laws 1929, § 15900).

7. Same—Equity—Jurisdiction—Fraud.

The only procedure by which a court of equity may inquire into account of trustees allowed by probate court is on bill to set aside orders for fraud (3 Comp. Laws 1929, § 15900).

8. Same—Advancements to Spendthrift.

Investment of spendthrift trust funds in mortgage in which beneficiary was mortgagor as owner of property *held*, not improper on ground loan was an advancement contrary to will establishing trust, where security seemed ample.

9. Same—Investments by Trustees—Care Required.

Whether a trustee has exercised the degree of care exacted of him in the matter of investments and their retention is a question to be answered in the light of contemporaneous circumstances, not subsequent events, as he has not unlimited authority to invest as an ordinarily prudent man would invest his own but he must take such risk only as an ordinarily prudent man would take who is a trustee of the money of others and such investments are subject to searching scrutiny in a court of equity as to diligence employed and sound judgment exercised.

10. Same—Testamentary Directions—Discretion of Trustees.

Direction in will that trustees were to be given discretion in manner of investing trust funds did not enlarge their powers of discretion since it is strictly a discretion to exercise more than ordinary care and prudence.

11. Same—Contingent Beneficiaries—Investments—Discretion of Trustees.

Contingent beneficiaries as to principal of trust fund who claim investments by trustees were imprudent have burden of showing such investments were specifically imprudent as to principal in which plaintiffs were interested, a showing that they were imprudent as to income being insufficient.

12. SAME—INVESTMENT OF FUNDS—ADEQUACY OF SECURITY.

Prudence of investment in March of 1928 of $85,000 of $363,839.90 trust in $5,000 notes secured by $120,000 mortgage on half interest in centrally located downtown store and office building property appraised at upwards of $325,000 and mortgagor had a large annual income and owned property valued at $350,000 *held,* a debatable proposition on the basis of adequacy of security.

13. SAME—ADEQUACY OF SECURITY.

Prudence of investment in September of 1929 of $3,000 of $363,839.90 trust in note secured, with others, by $42,000 mortgage on $70,000 interest in income property close to downtown business section of large city where mortgagor had a large annual income and owned property valued at $350,000 *held,* a debatable proposition on the basis of adequacy of security.

14. EVIDENCE—JUDICIAL NOTICE—DEPRESSION.

Supreme Court takes judicial notice of economic depression beginning in October, 1929.

15. SAME—PRUDENCE OF INVESTING TRUST FUNDS.

Prudence of investing large sums of spendthrift trust in mortgages on half interest in property subject to annuity in favor of aged widow *held,* evidenced by investment of other trust funds having same corporate trustee in balance of notes secured by the same mortgages.

16. JUDGMENT—RES JUDICATA—PROBATE COURT—TRUSTS—EQUITY.

In suit against trustees for unlawful diversion of trust funds, matter of adequacy of security of investments of trust funds *held,* settled by allowance of accounts by probate court 17 months before commencement of instant suit, in the absence of fraudulent concealment or misrepresentation (3 Comp. Laws 1929, § 15900).

17. TRUSTS—ACCOUNTS OF TRUSTEES—CONCEALMENT—FRAUD—EVIDENCE.

That trustees' accounts as to investment of funds failed to state that mortgages securing certain notes were subject to annuity payable to aged lady and that mortgagor had but a half interest was not a fraudulent concealment of such details *held,* evidenced by fact that at time investments were made even whether they were merely imprudent investments was only a debatable proposition (3 Comp. Laws 1929, § 15900).

18. JUDGMENT—TRUSTS—ALLOWANCE OF ACCOUNTS.

Allowance of trustees' accounts *held, res judicata* as to wisdom of investments in notes secured by mortgages on property under circumstances of the case, where failure to state certain details as to property interests in the account was not a fraudulent concealment (3 Comp. Laws 1929, § 15900).

19. TRUSTS—INVESTMENT OF FUNDS.

Investment of trust funds in September of 1932, after settlement of trustees' annual account in probate court in $3,000 note secured, with others, by $42,000 mortgage on property valued at $70,000 when mortgage was made but then greatly lessened in market value and income *held*, improper.

20. JUDGMENT—RES JUDICATA—TRUSTS—PROPRIETY OF INVESTMENTS.

Plea of *res judicata* cannot be raised in suit against trustees of spendthrift trust to recover alleged unlawfully diverted funds as to question of propriety of investment of trust funds after filing of account.

21. TRUSTS—SALE OF TRUSTEE'S PROPERTY TO TRUST ESTATE.

Courts frown upon sale of property by trustee to its trust estate.

22. SAME—LOAN BY TRUSTEES TO A COTRUSTEE.

In suit by contingent beneficiaries of spendthrift trust against cotrustees to recover alleged unlawfully diverted funds, transaction whereby trust funds were invested in notes secured by mortgages on property owned by one of the trustees who was also life beneficiary of the trust with power of appointment *held*, in effect a loan to one of the trustees as an individual and not a sale of trustees' property to trust estate in view of mortgagor's agreement with other trustee as mortgagee to permit such investment of trust funds.

23. JUDGMENT—RES JUDICATA—LOAN BY TRUSTEES TO COTRUSTEE.

In suit by contingent beneficiaries to recover unlawfully diverted spendthrift trust funds question as to propriety of investment of such funds in loan to one of the cotrustees *held, res judicata* where full disclosure that such was done was on the face of trustees' account submitted to and allowed by probate court 17 months before commencement of suit.

24. TRUSTS—CORPORATIONS—INVESTMENTS—JUDGMENT—RES JUDICATA.

Investment of spendthrift trust funds in stock of a public utility corporation which was considered a very good invest-

ment at the time it was made and was in fact but an exchange of stock in estate at death of testatrix *held,* proper and rendered unnecessary consideration as to whether allowance of the item by probate court was *res judicata.*

25. SAME—INVESTMENT OF FUNDS—CONSENT OF COTRUSTEE.

Purchase in April of 1930, at market price of bond representing portion of indebtedness of 50 per cent. of valuation of the property securing it, by corporate cotrustee without consent of other cotrustee from another trust being administered by seller *held,* improper notwithstanding lack of evidence that seller profited from the sale and though it later purchased other bonds from same issue at a higher price.

26. JUDGMENT—PROBATE COURT—EQUITY—TRUSTS—IMPROPER INVESTMENTS—CONCEALMENT.

Account of trustees for spendthrift trust, as allowed by probate court, which did not show that bond was purchased from, and at a profit to, another trust administered by one of the cotrustees and which fact was not otherwise called to attention of interested parties *held,* not *res judicata* as to such item in suit by contingent beneficiaries against trustees for unlawful diversion of trust funds where the investment was not a proper one.

27. TRUSTS—INVESTMENT—SECOND MORTGAGES.

Investment of spendthrift trust funds in second mortgage on property on which corporate cotrustee held first mortgage for approximately half of value of property, *held,* improper.

28. JUDGMENT—PROBATE COURT—EQUITY—TRUSTS—IMPROPER INVESTMENTS—CONCEALMENT.

Concealment of fact that mortgage in which spendthrift trust funds were invested was a second mortgage and that cotrustee was first mortgagee from account as filed and adjudicated in probate court rendered question as to propriety of such investment not *res judicata* in suit by contingent beneficiaries to recover unlawfully diverted trust funds.

29. TRUSTS—LOANS AND ADVANCEMENTS TO COTRUSTEE—EQUITY.

In suit by contingent beneficiaries to recover unlawfully diverted spendthrift trust funds from trustees, decree that corporate cotrustee should retain enough from income to individual cotrustee to reimburse trust estate for loans and advances of principal made to him *held,* ample to protect plaintiffs, where individual cotrustee was also life income beneficiary of the trust with power of appointment.

30. INTEREST—TRUSTS—RESTORATION OF IMPROPER INVESTMENTS.
    Upon restoration for improper investment by corporate cotrus-
    tee, made without consent of other cotrustee, interest from
    date of investment is chargeable, but where improper invest-
    ment is made with consent of other cotrustee who is also
    beneficiary for life as to income of trust, no interest may be
    recovered from corporate trustee.

31. TRUSTS—INCOME—REIMBURSEMENT OF ESTATE.
    Income of life beneficiary under spendthrift trust who is also
    an active cotrustee may not be withheld by corporate cotrus-
    tee for purpose of reimbursing trust estate for payment of
    any loss nor on account of improper investment in note se-
    cured by mortgage on his individually owned property.

32. COSTS—ATTORNEYS' FEES—CHANCERY CASE—COURT RULES.
    Attorneys' fees taxable as costs in chancery case in trial court
    are fixed by Court Rule No. 5, § 6 (1933).

33. SAME—APPEAL BY ALL PARTIES—MODIFICATION OF DECREE.
    Upon material modification of decree in chancery case in which
    all parties appear in Supreme Court as appellants or cross-
    appellants, no costs are allowed any party therein.

Appeal from Superior Court of Grand Rapids;
Taylor (Thaddeus B.), J. Submitted June 6, 1935.
(Docket No. 40, Calendar No. 38,405.) Decided
October 11, 1935.

Bill by Catherine Peck Roberts, Virginia Peck
Apted and Florence Peck Watson against Michigan
Trust Company, a Michigan corporation, cotrustee
under the will of Catherine Peck, deceased, and
Percy S. Peck, cotrustee and beneficiary under said
will, to restore unlawfully diverted trust funds and
for other relief. From decree rendered, defendant
Michigan Trust Company appeals and plaintiffs and
defendant Peck cross-appeal. Modified and af-
firmed.

*Norris, McPherson, Harrington & Waer,* for
plaintiffs.

*Butterfield, Keeney & Amberg,* for defendant
Michigan Trust Co.

*Lloyd E. Cooper,* for defendant Peck.

BUTZEL, J.    Plaintiffs, all adults, are the three
children of Percy S. Peck, who as trustee and bene-
ficiary under the will of Catherine A. Peck, deceased,
is a defendant herein, with the Michigan Trust Com-
pany, trustee under the same will, as co-defendant.
Under the will of Catherine A. Peck, the Michigan
Trust Company and Percy were named as executors
and trustees.  The value of the estate, at the time the
assets were turned over to the trustees of the trusts
hereunder, exceeded $1,400,000.  The will provided
for a number of specific bequests, including the crea-
tion of several trusts of smaller amounts for others.
One-half of the residue was left in trust for Percy
and the other one-half for his sister Clara.  The
value of the share of the residue turned over by the
executors to themselves as trustees for Percy was
$363,839.90, without taking into consideration some
assets that the executors still held for distribution.
Percy was only entitled to the income from the one-
half of the residue, thus set aside for him, during his
lifetime.  Percy received as income from the trust
set aside for him the sum of $38,643.20 for the
period from March 27, 1929, to December 5, 1931.
He was also given the power to designate by last
will and testament the person or persons to whom
the corpus should go upon his death, and in default
of his exercise of such power, the residue was to
go to his issue, if living.  The will also contained
spendthrift trust provisions.

Thomas M. Peck, Percy's uncle, had also left a
large estate.  He trusteed valuable parcels of prop-
erty on Monroe avenue and Library street in the city
of Grand Rapids to two trustees of whom the Michi-

gan Trust Company became the successor. The trustees were directed to collect the income, pay the taxes, look after the upkeep of the property and pay Thomas' widow an annuity of $4,000 during her lifetime. The balance of the income during her lifetime was payable to his brother and sister, John E. Peck and Catherine A. Peck, to whom he devised the property subject to the life interest of his widow. Catherine A. Peck deeded her interest in the property to her brother, John E. Peck, who thus became the owner of the two parcels, subject to the payment of the annuity to Thomas Peck's widow in the manner stated. John E. Peck, upon his death, left his interest in these properties to his two children, Percy and Clara, but subject to the payment of the income to John's widow during her lifetime. The latter also died and the title to the properties appears to have vested in Percy and Clara subject to the annuity payable to the widow of Thomas M. Peck, a very aged lady with but a short expectancy of life at the time of the giving of the mortgages hereinafter referred to.

Upon the appointment of executors and trustees of the estate of Catherine A. Peck, the question arose as to the amount of bond to be exacted of Percy. In a written statement to the probate court he agreed that the custody and control of the funds should remain in the Michigan Trust Company, his co-executor and co-trustee, and his bond therefor was fixed at only $10,000 although the assets of the estate exceeded $1,400,000. Notwithstanding the fact that the control and custody nominally remained in the Michigan Trust Company, Percy nevertheless qualified and fully exercised his rights and duties as co-executor and co-trustee. Plaintiffs complain of acts in which Percy participated and from which he was the recipient of all of the benefits.

However, the present suit obviously is brought to fasten the losses on the corporate trustee, apparently the only one with financial responsibility. The record does not show Percy's net worth at the time of the acts hereinafter complained of, but he undoubtedly was considered a wealthy man at that time. He was also engaged in the business of indorsing paper for others for a consideration.

The first investment complained of arose as follows: On March 2, 1928, Percy, in his individual capacity, applied to the Michigan Trust Company for a loan of $120,000 on his one-half interest in the Monroe avenue property. In a written application, he represented the entire parcel to be 44 feet by 88 feet, improved with a five-story office building, with an average gross rental of $16,400 per year for the stores on the ground floor and $12,000 per year for the upper floors. The loan was to be represented by 24 serial notes of $5,000 each running to the Michigan Trust Company as trustee, the sum of $5,000 becoming due each year over a period of 10 years when the entire balance was payable. At the time of the execution of the mortgage, in accordance with the application, Percy gave a written direction to the trust company to invest funds that would become available in his trust under the will of Catherine A. Peck, deceased, in the mortgage notes; $85,000 of the notes were acquired from such funds shortly thereafter. On the division of the residue of the estate between Percy and his sister, these notes were allocated to Percy's trust. In March, 1929, an additional $5,000 note was acquired. However, a $5,000 note had been paid so that the trust still owned $85,000 of these notes.

The second investment complained of arose as follows: Percy borrowed the sum of $42,000 on the Library street property hereinbefore mentioned, the

loan running to the Michigan Trust Company as trustee and secured by 14 notes of $3,000 each. At the time of the execution of the mortgage a $3,000 note was acquired for Percy's trust. Later a note was also acquired for an *inter vivos* trust established for Percy and his wife by Thomas M. Peck, referred to later in this opinion. In September, 1932, D. Bradford Apted, the husband of one of the plaintiffs herein, in a letter to the trust company, stated that Percy's wife protested against the placing of the $3,000 note in the *inter vivos* trust and that it was entirely agreeable to Percy that the investment be transferred to his own trust under the will of Catherine A. Peck. This was done.

The third investment complained of by plaintiffs was the purchase on April 15, 1930, of a $1,000 bond of a large issue of the Comstock Investment Company of Detroit, secured by a mortgage on land centrally located in Detroit and underwritten by a trust company of high standing in Detroit.

Objection is further made to the acquisition of 680 shares of no par common stock with 332 option warrants, and scrip for 56/80ths of a share of no par common stock of the Commonwealth & Southern Corporation, a large public utility company that took over the properties of the Commonwealth Power Corporation. Under the will of Catherine A. Peck, her executors and trustees were authorized to retain any shares held by her at the time of her death, notwithstanding the fact that such action might otherwise be in violation of the laws in relation to trust investments. At the time of Mrs. Peck's death, she was the owner of 151 shares of the stock of Commonwealth Power Corporation, a company rated very highly by investment authorities. Shortly after her death, rights were issued to her executors

enabling them to purchase 15 additional shares at a price materially less than the market at that time. Upon a division of the residue estate between the two trust funds, established for Percy and his sister, the latter ordered the one-half of the Commonwealth Power Corporation shares sold and the sum of $7,149.20 was realized on the sale. Percy's shares, however, were kept with his knowledge and consent and carried on the books at the price at which his sister's stock had been sold. Later the 83 shares held in Percy's trust were exchanged for the Commonwealth & Southern Corporation stock, which was considered at the time as a very good investment, derived from the stock that belonged originally to the estate. Some question arose as to the propriety of the trust company basing its commission on the enhanced value of the new shares of stock. This would make a difference of only $34 in fees. No complaint was made on that account in the bill of complaint and we shall not dwell upon it. It was proper for the trust company to value the stock at the market price as established by the sale of the stock at the time of the division between Percy and his sister.

Complaint is also made of a loan of $2,500 to Lewis A. Geistert for a period of three years with interest at six and one-half per cent. per annum secured by a second mortgage on a new home constructed by Geistert in a high-class residential district of Grand Rapids. The trust company had loaned him $10,000 on a first mortgage. He required an additional sum of $2,500. This made the aggregate amount of the loans $12,500. Percy requested in writing that the loan be made. The property was valued at $20,000 although Geistert claimed it was worth more. Payments, however,

were made on the two mortgages so that the $2,500 loan was reduced to $2,000, and the $10,000 loan to $8,500 prior to the beginning of the instant suit.

The final transactions complained of were advances of income amounting to $4,782.99 made to Percy at various times.

On August 26, 1932, the Michigan Trust Company and Percy filed their first testamentary trustee account in the probate court of Kent county, the court which had appointed them. It was duly signed and verified by them and covered the five-year period from May 21, 1927, to May 21, 1932. It set forth all of the investments hereinbefore discussed except the subsequent purchase of the additional $3,000 note secured by the mortgage on the Library street property. Contemporaneously with the filing, the accounts of other trusts established by the will of Catherine A. Peck, deceased, were also filed. The probate judge entered an omnibus order stating that the Michigan Trust Company filed its first account as trustee under the will for Percy's sister, its fifth annual account as trustee under the will for John Peck Caulfield *et al.*, the fifth annual account of the trust company and Percy S. Peck as trustees under the will, etc., and directed notice by publication. The notice was duly published and on the 23d day of September, 1932, orders were entered in the matter of the estate of Catherine A. Peck, deceased, allowing each of the accounts. While the trusts were distinct, they all were created under the will of Catherine A. Peck, deceased, and there was no impropriety in making and publishing the omnibus order, giving notice of the hearing of all of the trust accounts established under the will in one estate. The notice fully stated the title and name of the estate, referred to each individual trust, and anyone interested could readily have seen that each trust

was specifically mentioned. Section 15880, 3 Comp. Laws 1929, provides for the rendering of the accounts of testamentary trustees and the giving of notice in accordance with 3 Comp. Laws 1929, § 15538, which requires that notice shall be given either by service or by publication as the court shall direct. The court directed notice by publication. This was sufficient notice to plaintiffs.

The account of the trust for Percy S. Peck set forth the investment of $85,000 in notes secured by the mortgage on the Monroe avenue property as follows: Under the title "Inventory—Mortgages," it appears as

"A $90,000 interest in No. 8445 Percy S. Peck, Mar. 19, 1929, six per cent. Principal payments $5,000. Forward $85,000 Income collected period Sept. 19, 1928, to Mar. 19, 1932 (on $85,000). Net $17,850. Interest on interest $14.45."

Under the title "Investments" it appears again as follows:

"Notes secured by mortgage No. 8445, given by Percy S. Peck, dated Mar. 19, 1928, face $120,000 interest six per cent. payable semi-annually, covering property known as Nos. 83–85 Monroe Ave., Grand Rapids, Michigan:
"Notes Nos. 1, 2, 3, 4, 5, and 8 due Mar. 19, 1929, 30, 31, 32, 33, 36 and Nos. 12 to 22 inclusive, all due Mar. 19, 1939                                     $85,000
Accrued interest, Sept. 19, 1928 to Mar. 8, 1929
                                                            2,394.16
Mar. 19, Note No. 9 for $5,000 due Mar. 19, 1937,
Bought for face of note                             5,000."

The investment in the $3,000 note also appears twice with details in regard to the mortgage. The investment in the Comstock Investment Company bond and in the Lewis A. Geistert second mortgage

also appear twice. The details, however, are not entirely complete. The account does not show on its face that the mortgages cover only a one-half interest in the Monroe avenue and Library street property, which is subject to the annuity, nor does it show that the Comstock Investment Company bond was bought at a profit from the trust company as trustee of another estate, nor does it appear that the Geistert mortgage is a second mortgage. The full facts and particulars in regard to the Commonwealth & Southern Corporation stock are set forth.

On February 16, 1934, almost 17 months after the allowance of the account by the probate court, Catherine Peck Roberts, Virginia Peck Apted and Florence Peck Watson, the three children of Percy S. Peck, filed a bill of complaint against their father and the Michigan Trust Company as trustees claiming that the mortgages and advances to Percy, the beneficiary of the trust, are forbidden under the 14th paragraph of the will, that the amounts loaned on the mortgages were inadequately secured, that the investments hereinbefore referred to were illegal and fraudulent, that trustees may not lawfully borrow trust funds. They asked that the trustees be ordered to restore to the trust fund the amounts expended for the investments hereinbefore set forth including also the sum of $3,000 for an additional note of like amount secured by the Library street property and acquired subsequent to the allowance of the account. They also asked that the trustees restore to the fund the advances made to Percy.

The plaintiffs are contingent remaindermen under the trust, taking in default of appointment by Percy S. Peck, as is provided by the will in this case. The defendants claim that plaintiffs have no interest in the trust fund, inasmuch as they may never have any rights whatsoever if Percy exercises his power

of testamentary disposition in favor of others, or if plaintiffs should predecease Percy. We believe that plaintiffs have sufficient interest in the property so as to be entitled to file this bill of complaint. Contingent remaindermen are not forced to sit idly by and see the corpus of an estate wasted away or destroyed through illegal or improper investments. Plaintiffs are not interested in the income from the trust during their father's lifetime, but they may secure the preservation of the corpus in accordance with the terms of the trust. See *Hunt* v. *Hunt*, 124 Mich. 502, 507, in which the interest of the plaintiffs was very similar to that in the instant case. The testatrix empowered the life beneficiaries to "devise the property * * * but, should either fail to make a will, then it was to go to the heirs of each one." In an attempt to *terminate* the trust, it was held that the prospective heirs of one of the life beneficiaries were entitled to take proceedings to protect the trust fund. It is true that the subject dealt with was a *termination* of the trust while in the instant case we face the problem of enforcing the proper execution of the trust. However, the reasoning underlying in *Hunt* v. *Hunt, supra,* applies as well in the instant case. As was said in *Hunt* v. *Hunt, supra:*

"This intention of the testatrix must be carried out. * * * They (the contingent remaindermen) are therefore entitled to take proceedings to protect the trust fund, to compel the appointment of trustees, *and to have them properly execute the trust."*

In Lewin, Trusts (13th Ed.), p. 874, the correct rule is stated as follows:

"And generally a *cestui que trust,* who can allege an existing interest, however minute or remote, may, upon reasonable cause shown, apply to the court to have his interest properly secured."

In *Carson* v. *Kennerly*, 8 Rich. Eq. (S. C.) 259, it was held that a party entitled to a contingent remainder or interest might, under proper circumstances, be permitted to maintain an action for the preservation of the property in case his contingent rights should thereafter become vested, the criterion by which the court would determine the propriety of granting him relief being the reasonable probability that his claim would vest.

In *Clarke* v. *Deveaux*, 1 S. C. 172, it was held that *cestuis que trustent* whose interests were future and contingent were entitled to maintain a bill in equity for the purpose of preserving the trust fund.

The plaintiffs have sufficient interest in the trust estate to allow them to bring this suit. The objections of the plaintiffs to the investments can be summarized as follows:

1. The trust company, when it loaned trust funds to Percy S. Peck, was violating the spendthrift trust provisions of the trust agreement.

2. The investments were not adequately secured.

3. The trust company was selling property to itself as trustee.

4. The trust company was loaning to a co-trustee.

However, even if these objections be valid, they may be barred by virtue of the action of the probate court, 17 months before this suit was brought, in allowing these accounts. Section 15900, 3 Comp. Laws 1929, provides:

"The decree of the court having jurisdiction allowing any account of a trustee shall, except in cases of fraudulent concealment or fraudulent misrepresentation on the part of the trustee, be final and conclusive against all persons interested in such account and legally competent at the date of such decree. * * * But such decree may be appealed

from in the manner provided in the next section of the chapter.''

In *Hall* v. *Grovier,* 25 Mich. 428, 436, the court said:

''The object of a settlement is not merely to ascertain what items ought to be placed on the debit side of the administrator's account, subject to evidence on a future proceeding, that he ought not to have been charged therewith as between himself and the estate. Its scope is more comprehensive and complete.

''The end to be accomplished is to judicially liquidate and settle the affairs of his trust, and determine the rights of the estate as against him, and his rights as against the estate, *and the proceeding involves an adjudication upon each item.* Parties interested may surcharge, or falsify the account, and the administrator may proceed by discharge, and defense. The dispute, if any, may turn upon the introduction and allowance of new items, or the allowance of old ones. Evidence may be produced on each side, so far as necessary, and when the hearing is closed, the court must adjudge what to allow and what to disallow, and settle the particular account. *When the determination is made, the account adjudicated upon is settled on both sides.* The result is not partial, and measurably inconsequent, as it would be if it only effectuated a correction of the debit side of the account as rendered by the administrator, and left it open to him thereafter, in effect, to strike out inserted items, by proof that he had applied them for the benefit of the estate, before the settlement.''

In *Chapin* v. *Chapin,* 229 Mich. 515, 521, the court held as follows:

''There can be no doubt that the orders made have the force and effect of judgments in courts of

record and are *res judicata* of the matters therein disposed of."

In *Heap* v. *Heap*, 258 Mich. 250, 258, the court said:

"The orders of probate court are judgments, *res judicata* of the matters involved, and cannot be attacked collaterally. *Chapin* v. *Chapin*, 229 Mich. 515. *The allowance of an account is an adjudication of each item of it. Hall* v. *Grovier*, 25 Mich. 428. The probate court determined, as it had to do to render the judgments, that the administrators had paid all debts, allowances, and residue reported by them. The finding of the payment of claims and residue is binding on the interested parties and is not open to question in a collateral proceeding. *Clark* v. *Fredenburg*, 43 Mich. 263. Except on appeal, no other court may inquire into the sufficiency of the testimony to determine whether it sustains the findings and orders nor, indeed, whether they were supported by any evidence. * * * *The orders therefore were judgments that the receipts were valid.* The only procedure by which a court of equity may inquire into the account is on a bill to set aside the orders for fraud."

See, also, *MacKenzie* v. *Union Guardian Trust Co.*, 262 Mich. 563, 579.

I. *The Monroe avenue and Library street mortgages.*

1. *Were they in violation of the spendthrift trust provisions?* It is not necessary to discuss the question of *res. judicata* here, as we believe that there was no valid objection. When Percy S. Peck executed the mortgages on the Monroe avenue and Library street properties to the Michigan Trust Company, the record shows that it was agreed that as soon as funds in the principal trust became available, they would be invested in these mortgages. The will itself created what is known as a "spend-

thrift trust." Paragraph 14 of the will reads as follows:

"No person beneficially interested in any legacy or devise given by this will * * * shall have power to assign, convey, pledge, hypothecate or anticipate the payment of any sum or delivery of any property which may at any time be or become due or payable by way of income or principal, under the terms of this will."

Plaintiffs claim that the agreement between Percy S. Peck and the Michigan Trust Company was a violation of the spendthrift trust provisions in the will, and therefore the investment of the trust funds in this mortgage was improper, and there was a fraudulent concealment of that fact, for nowhere in the account of the trustees does this agreement appear, nor does the account give any source from which one might gather the facts of this agreement. The lower court placed much emphasis on this agreement, saying:

"This constituted an advance to Mr. Peck contrary to the explicit words of the will and constituted a fraud upon the trust estate."

The will itself, in part, reads:

"No person beneficially interested * * * shall have the power to assign * * * or anticipate the payment of any sum or delivery of any property which may at any time be or become due or payable by way of income or principal."

Clearly, Percy S. Peck would never receive the principal under this will for his power as to the principal was merely one of appointment. Therefore, the fact that Percy Peck received, directly or indirectly, a loan made in good faith on mortgage security that seemed ample out of the corpus of the trust did not violate in any way the restraint set up

by the will. For the restraint, as to him, applied only to the property which he was to receive, namely, the income. Therefore, the investment being no violation of the will, the mere concealment of the agreement does not make the investment improper. No impropriety is to be found in these investments on this ground.

2. *The investments were not adequately secured.*

Our approach to this problem ought to be tempered by the words of the court in a recent Delaware case:

"Whether a trustee has exercised the degree of care exacted of him by the duties of his office in the matter of investments and their retention, is a question which is to be answered in the light of contemporaneous circumstances, and not in the light of subsequent events." *In re Cook's Trust Estate,* 20 Del. Ch. 123 (171 Atl. 730).

In *Re Buhl's Estate,* 211 Mich. 124 (12 A. L. R. 569), the court held:

"A trustee has not unlimited authority to invest as an ordinarily prudent man would invest his own; he must take such risk only as an ordinarily prudent man would take who is a trustee of the money of others. In making such an investment, he always assumes the risk of a searching scrutiny in a court of equity as to the diligence employed and sound judgment exercised by him in the transaction."

The fact that the trustees were given discretion in the manner of making investments "did not enlarge the powers or discretion of the trustees. * * * Strictly it was a direction to exercise more than ordinary care and prudence." *Michigan Home Missionary Society* v. *Corning,* 164 Mich. 395, 402.

With this standard of duty in mind, let us examine the various investments made by the Michigan Trust Company in this case, giving, however,

full weight to this idea: We believe that if the plaintiffs are to succeed, they must show not only that the investments were imprudent, but that the investments were imprudent specifically as to them. In other words, the interest of the plaintiffs is not in the income of the trust estate but in the principal. To show that the trustees were imprudent in making these investments solely as to income is not enough. Plaintiffs must show that it was also imprudent as to the principal. See *Lannin* v. *Buckley,* 256 Mass. 78, 83 (152 N. E. 71), in which it was held that the distributees of the principal could only object to the trustee's actions as those actions injured the *principal*.

As to the Monroe avenue property, testimony shows that other property on Monroe avenue in the vicinity of this parcel sold at $8,000 per front foot. The land was estimated to be of the value of $7,000 per foot or an aggregate of $308,000. In 1925 an appraisal by engineers of high standing showed the reproduction valuation of the building to be $103,490.16 and the sound or depreciated value, $73,525.19. Prior to Percy's application for the loan, an offer of $325,000 for the property had been refused on account of the objection of Percy's sister who insisted on a price of not less than $350,000. The Michigan Trust Company, following its usual custom, made an independent appraisal of the property and placed the value of the land at $264,000 and the buildings at $61,500. The property is adjacent to that of the Grand Rapids Trust Company and located in the very heart of the central business district of Grand Rapids. Net rentals from the property, however, were not large. For the year ending June 16, 1928, they only aggregated $9,453.98, while those from the property on Library street, hereinafter referred to, amounted to $3,958.54, a total of

$13,412.52. This did not include a charge or deduction by the Michigan Trust Company of $2,000 for services for looking after the property nor the payment of the $4,000 annuity to the widow of Thomas M. Peck. After these deductions, there remained only a net return of $7,412.56, for equal distribution between Percy and his sister. However, the following year, the net earnings arose to $17,099.35 which, after the deductions for services and the annuity, left $11,099.39 for distribution between Percy and his sister. The trust company was undoubtedly familiar with the earnings of the property under its own management. The testimony shows that the trust company also relied on Percy's financial responsibility as well as the central location of the property and the belief that it would become more productive and there would be an increment in the value over a period of time. The trust company knew that the interest of the widow of Thomas M. Peck, about 80 years of age, was *de minimis*. Upon her death the owners on foreclosure would be freed from payment of the annuity and the management charges of the trust company. Before making the loan, the trust company not only had the title examined by its own attorneys, but was furnished with the opinions of two of the leading attorneys in Grand Rapids showing Percy's vested interest in one-half of the property subject to the charges. The property as appraised by officers of the bank and others was found to be in the neighborhood of $375,000. Taking that figure, Percy's interest in the property was approximately worth $185,000, disregarding the annuity. On these facts alone it would seem that a $120,000 mortgage on an interest worth approximately $185,000 would not be very prudent. However, there are additional facts in this case that change the picture somewhat. In

1928, Percy was considered a man of large means. He had the life interest and the power of appointment of one-half of the residue of the principal estate; he had acquired half of the residue of the estate of his father, John E. Peck, which approximated about $350,000; he and his wife were the recipients of the income of an *inter vivos* trust with a fund of over $145,000 settled on them by an uncle, Thomas M. Peck, bringing to them during the period of 1928 to 1930 some $26,000; and Percy also was engaged in some business. With these facts in mind and the character of the property, it is questionable whether this investment was improper on the ground that it was inadequately secured.

As to the Library street property, testimony showed that the land and buildings on the property were worth $142,600 on September 30, 1929, when the mortgage was made. The land was considered worth in the neighborhood of $500 per front foot. The lot had a frontage of 99 feet on Library street and was 132 feet in depth, and was situated close to the downtown business section of Grand Rapids. There were two buildings on the property, one fronting on Library street and another in the rear and known as the Peck-Johnson building. The notes matured serially, a note of $3,000 falling due every year until payment of the entire mortgage indebtedness. The property was likewise appraised by a firm of high standing which stated that the depreciated value of one building was $78,948.69, and of the other $21,432.05; $84,000 of fire insurance was carried in policies containing 90 per cent. co-insurance clauses. Testimony again shows that the trust company did not rely upon the rental income as much as upon Percy's financial responsibility and the fact that the security consisted of business property with a potential increment. Real estate op-

erators appraised the land and buldings at the sum of $142,000. One of the officers of the trust company claimed it was worth $150,000. Percy Peck's interest, therefore, approximated $70,000. A $42,000 mortgage on the $70,000 interest in a piece of property in view of the wealth that was Percy's presents a close case as to the wisdom of the investment.

If it be remembered that plaintiffs' interest was only in the principal, it can be said that, although from the point of view of income there might have been some question, the corpus of the estate was not injured, since both the Monroe avenue and Library street investments were made on very valuable real estate in Grand Rapids and at a time prior to the depression, of which we take judicial notice; and it is generally known that property of this kind is scarce and desirable and as a rule readily salable. The annuity to Thomas M. Peck's widow did not detract much from the security because of her advanced years. There is additional evidence pointing out that at the time the investments were considered prudent, by virtue of the fact that the other notes under both mortgages were sold to various trust funds of which the Michigan Trust Company was trustee. These included a trust for the benefit of a former president of the trust company, another for a sister-in-law of the chairman of the board of directors. The mortgages also contained pledges of the rent as additional security.

This question of the adequacy of the security presents a debatable proposition which we need not decide, since that question was permanently settled by the allowance of the accounts by the probate court. As the statute reads, the allowance is conclusive unless there has been fraudulent concealment or misrepresentation. The very fact that we seriously

doubt whether these investments may be classified as imprudent lends weight to the holding that there was no fraudulent concealment or misrepresentation here. While it is true that the facts of the annuity and the one-half interest of Percy in this property were not set out in the account, the careless omission of details of the loan for the sake of brevity was not a fraudulent concealment or fraudulent misrepresentation in the instant case.   The facts in each case must be considered in determining whether fraud exists. There was an unambiguous reference in the account to the mortgages and the mortgages very clearly set out Percy's interest in the properties.   While there is no positive testimony that plaintiffs knew that their father only owned one-half of the property, it almost can be presumed that they would have had this information or would have known of this fact in the gatherings where business matters were discussed.   All three plaintiffs testified in the case.   They professed ignorance in regard to the conduct and investments of the trust and the filing and approval of the account in the probate court. They, however, showed that they were on affectionate terms with their parents and with one another. The family was a close one.   They had round-table discussions together when business matters were discussed.   They claim that while they knew in general about the will of Catherine A. Peck and the Peck properties, they were unfamiliar with the details.   It is also significant that on September 13, 1932, D. Bradford Apted, the husband of one of the plaintiffs, wrote to the trust company asking that the $3,000 block mortgage be transferred from the trust for Percy and his wife to Percy's trust and that it would be entirely agreeable to Percy.   Schedules showing a statement of the property in the

trusts were sent to Mr. Roberts, the husband of another of the plaintiffs, under date of December 17, 1932.

Mr. Roberts, Mr. Apted and Mr. Watson, husbands of the plaintiffs, came to the office of the trust company to get information or to bring information to them, but neither Mr. Roberts nor Mr. Watson saw the witness so testifying in connection with the affairs of the trust. Two of the plaintiffs stated that they knew that their father and their aunt had an interest in the properties. In some cases the failure of the trustees to fully state the make-up of the security *will* amount to fraudulent concealment and misrepresentation; but on the facts of this case, the failure to do so did *not* constitute "fraudulent concealment and fraudulent misrepresentation," and therefore, the allowance of the accounts became *res judicata* as to the wisdom of these two investments.

As to the $3,000 note purchased after the submission of the account, that was an improper investment even though approved by Percy and the husband of one of the plaintiffs. The note was purchased in September, 1932. This was three years after the depression began. The values of real estate in general had already begun to decline prior to September, 1929. For the year ending June 16, 1932, the total income from both the Monroe avenue and Library street property was only $920.97 after the deduction of the trust company's reduced charges and the annuity to Thomas M. Peck's widow. The total gross income from the Library street property, before applying any part of it to the deductions, was only $709.66. The present case might be termed as a "depression case." Counsel for defendant trust company stress this fact in a rather

convincing manner and rely upon it. By the same token, we cannot approve of the purchase of the additional $3,000 note secured by the Library street property. The plea of *res judicata cannot* be interposed since the investment was made after the order of the probate court allowing the accounts.

3. *The trust company was selling property to itself as trustee.* The courts frown upon the selling of the trustee's property to the trust estate. *Kelsey* v. *Detroit Trust Co.,* 265 Mich. 358; *Smith* v. *Tolversen,* 190 Minn. 410 (252 N. W. 423); *First National Bank of St. Petersburg* v. *Solomon* (C. C. A.), 63 Fed. (2d) 900; *Hammond* v. *Hopkins,* 143 U. S. 224, 251 (12 Sup. Ct. 418); 3 Bogert, Trusts & Trustees, § 489. We, however, shall not lay down any rule in the instant case. The Library street note went directly into the trust estate when the mortgage was made so that on that note it cannot be said that it was a sale by a trust company to the trust estate. Neither was the Monroe avenue investment a sale by the trustee of its property to the trust estate. On the face of it, it would seem that the trust company sold to the instant trust estate Monroe avenue notes belonging to itself and to itself as trustee of other estates. But in effect the transaction was a loan by the two trustees to one of themselves as an individual. The fact that the mortgage was first given to Michigan Trust Company does not conceal the fact that by virtue of the agreement between the Michigan Trust Company and Percy S. Peck the net effect of the transaction was a loan by the trustees to Percy. If the notes had been bought by the Michigan Trust Company *unaccompanied* by any agreement to transfer them to the trust estate, then the question would arise whether that transaction was not a sale by

a trustee of its property to the trust estate. But here the agreement made this transaction such as to bring up *only* the question of trustees loaning trust funds to one of themselves. The plaintiffs themselves admit that the Library street and Monroe avenue investments did *not* constitute a sale by the trust company to the trust estate, for their argument that the investments violated the spendthrift trust provisions *is based upon the theory that these investments constituted a loan by the trust company of trust funds to Percy S. Peck, a co-trustee.*

4. *The trustees were loaning to one of themselves.* This objection cannot now be raised, as the point is *res judicata.* There was full disclosure on the face of the account submitted to and allowed by the probate court that the loans were made to Percy S. Peck. There was no concealment or misrepresentation of that fact. The probate court was the proper place to try the issue, and as no appeal was taken from the allowance of the accounts, and there was no fraudulent concealment or misrepresentation of the fact, we will not now allow the point to be raised.

II. *The Commonwealth & Southern Corporation stock.* The investment was proper in every respect. It is, therefore, unnecessary to consider whether the allowance of this item by the probate court was *res judicata.*

III. *The Comstock Investment Company bond.* The investment was improper. The entire issue amounted to $1,200,000, the land being valued at $2,400,000. At the time of the purchase of this bond for Percy's trust, the trust company was engaged in selling the assets of another trust holding the bond and the testimony indicates that it was sold to the Peck trust at the market price at which the bonds were selling, though at a profit to the

trust from which the purchase was made. The trust company evidently considered the bond good. Testimony shows that the trust company subsequently purchased other bonds of the same issue at a slightly higher price. The bond was not in default at the time of its purchase and two installments of interest, that subsequently became due, were paid. The purchase of the bond was approved by three trust officers who based their opinion on information received from the Detroit Trust Company and others whom they believed reliable. While there is no testimony whatsoever to show that the trust company profited in the least by the transaction and it is shown that the bond was purchased at the market price and that other purchases were made by the trust company at a higher price, we nevertheless cannot overlook the fact that the purchase was made on April 15, 1930, over six months after the depression began, and when values in many instances had depreciated. Although it was not known at the time how long the depression would continue, nevertheless, with the recession in values, we do not believe that the purchase was a prudent one. It is true that Percy S. Peck approved of the purchase in the account of the testamentary trustees, but testimony indicates that the purchase was made without his consent. We find it to be improper on that ground also. See *Loud* v. *Winchester,* 52 Mich. 174. The Comstock bond investment was improper. May the plea of *res judicata* be interposed? Had the plaintiffs examined the final account they would not have discovered therein that the purchase had been made by the trust company from one of its own trusts at a profit. We can readily see how a large trust company may find it necessary to sell a high-grade security for one of its

trusts and it may have funds for investment in another trust. Securities such as mortgage bonds, etc., as a rule are unlisted and there is no market price for them. Sometimes good securities are scarce. The trust company acting in good faith may deem it advisable to make the sale and purchase. It nevertheless is acting for both buyer and seller, and the transaction, if attacked, will be set aside on failure of the trustee to show absence of any irregularity or of any personal benefit to itself. It must also show that at the time of the transfer, the sale, purchase and price were advantageous and fair to the various interested trusts. The account, moreover, does not show that the trust company and its investment affiliate company had marketed large blocks of the bonds in Grand Rapids. The purchase of this bond was improper; the adjudication on that item was not conclusive; the purchase of the bond at a profit to another estate of which the trust company was trustee should have appeared on the account or been called to the attention of interested parties.

IV. *We also find the investment in the Geistert second mortgage improper.* The rule appears in 3 Bogert, Trusts and Trustees, § 675, where it is said:

"While loans secured by second mortgages on land are sometimes allowed, they are generally disapproved by courts of equity."

The same rule, with adequate authorities, appears in 3 Prentice Hall, Trust Service, § 15026; also in 3 Beach, Trust and Trustees, § 532. In *Schuey* v. *Latta,* 90 Ind. 136, the facts were these: The trustee of an estate held a first mortgage in his own right on a piece of property. As trustee he took a second mortgage on the property. The court held

that his first mortgage was held for the benefit of the trust. We follow the rule, as announced in the case of *Taft* v. *Smith*, 186 Mass. 31 (70 N. E. 1031):

"We are aware that in several cases in other States it has been stated that a trustee should not invest in second mortgages. While we accept that as a principle generally to be applied, we cannot accept it as an absolute, ironclad rule. After all, the true rule is whether under the circumstances sound discretion was exercised, and it cannot be said that under every conceivable practical set of circumstances an investment in a second mortgage is inconsistent with sound discretion."

A second mortgage loan by testamentary trustees may be safe and proper under certain circumstances. This may depend largely upon the size of the first mortgage loan and the security. As a rule, second mortgage loans are not considered proper for trust investments and notwithstanding the fact that the making of the loan was free from fraud and resulted in no profit to the trust company and was made at the written request of Percy, nevertheless it was on property on which the trust company already held a first mortgage loan for approximately 50 per cent. of the value of the property. The loan was improper. May the plea of *res judicata* be interposed? There was a concealment of the fact that this was a second mortgage and that the first mortgage was held by the trust company. The concealment of these facts, which make the investment of such doubtful character, bars the trust company from claiming *res judicata*.

V. *Plaintiff's further claim that the $4,782.99 loaned and advanced to Percy should be restored by the trust company.* This would result in Percy being able to continue to enjoy his income freed

from the loans and advances made to him to pay necessary expenses. They claim in somewhat euphemistic language that the trustees have defrauded the estate by illegal and improper investments but they do not emphasize the fact that all the larger transactions were with Percy's full consent and for his sole benefit. They go so far even as to attack the provisions both in the Monroe avenue and the Library street mortgage's pledging the rents for payment of interest. Plaintiffs have no present interest whatsoever in the income from the corpus of the trust and the holding in the lower court that the trust company should retain enough from Percy's income to reimburse the trust estate fully protects the plaintiffs' interest in the principal. Percy even though a nominal defendant is not a party plaintiff, nor has he filed a cross-bill. His position does not appeal to a court of equity.

The trial court disapproved of the investments in the notes secured by the mortgages on the Library street and Monroe avenue property, and in the Geistert second mortgage. It approved of the advances amounting to $3,522.99 to Percy in anticipation of income. It ordered the restoration of the $91,000 represented by notes secured by the Monroe avenue and Library street mortgages, but without interest and that in the event of any loss, defendant trust company was to be reimbursed out of Percy's income from the trust. It also made the same provision in regard to the Geistert mortgage. The court also decreed that plaintiffs should have reasonable counsel fees and costs of the suit. The decree is modified to provide that restoration to the trust should be made by the trustees only for the investments in the second $3,000 note secured by the Library street property purchased in Septem-

ber, 1932, in the $1,000 Comstock Investment Company bond and in the Geistert second mortgage on which there is still a balance of $2,000 due. Restoration shall be made as of the date of the purchase together with any unpaid interest on the Comstock bond, but without interest as to the additional $3,000 in Percy's note secured by the Library street property and without interest as to the Geistert second mortgage, made at Percy's written request. The decree shall contain no order as to the application of Percy's income from the trust fund for the payment of any loss nor on account of the additional mortgage note of $3,000 in the mortgage secured by the Library street property. In taxing costs in the lower court, plaintiffs will not be allowed attorney fees in excess of the amount fixed by Court Rule No. 5, § 6 (1933). Inasmuch as all parties appear as appellants or cross-appellants and material changes have been made in the decree by the trial court, neither parties will recover costs in this court. A decree may be entered in accordance with this opinion.

POTTER, C. J., and NELSON SHARPE, NORTH, FEAD, WIEST, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.