### BINDER, ESTATE OF, In re

Ohio Appeals, 8th Dist, Cuyahoga Co.

No. 17105. Decided Sept. 15, 1939.

Orgill, Maschke and Wickham, Cleveland; I. R. Winsper, Cleveland, and Louis W. Wickham, Cleveland, for exceptors.

Thomas J. Herbert, Cleveland, A. C. Husband, Cleveland, and Ulmer, Berne & Gordon, Cleveland, for Superintendent of Banks.

A. G. Newcomb, Cleveland, for depositors.

Maxwell & Ramsey, Cleveland; Marshall, Melhorn, Davies, Wall & Bloch, Cleveland, and Baker, Hostetler & Patterson, Cleveland, Amici Curiae.

Mooney, Hahn, Loeser, Keough & Freedheim, Cleveland, and Charles F. Carr, Cleveland.

HAMILTON, PJ., MATTHEWS and ROSS, JJ. (1st Dist.), sitting by designation.

## OPINION

By ROSS, J.

The Guardian Savings & Trust Company, later called The Guardian Trust Company, became trustee under the last will of Henry Binder, deceased. The Superintendent of Banks succeeded to such trusteeship by reason of the liquidation of the Trust Company.

Exceptions were filed to the final account filed by the conservator, and to the 5th, 6th and 7th partial accounts filed by the Trust Company. These exceptions involved seven different issues of land trust certificates which were purchased for the trust by the Trust Company. The Probate Court sustained the exceptions as to all seven issues. On appeal to the Common Pleas Court, the action of the Probate Court was sustained and followed as to five of the issues and disproved as to two of the issues. From the judgment of the Common Pleas Court, where trial was had de novo, appeals on questions of law have been prosecuted to this court.

The Superintendent of Banks in case No. 17080 has filed an appeal from the action of the Common Pleas Court of Cuyahoga County, sustaining five of the exceptions, and the exceptors in case No. 17105, have filed an appeal on questions of law from the action of the Common Pleas Court, overruling two of the exceptions. These two appeals involving the seven separate exceptions have been heard together, and this opinion covers both appeals.

The terms of the trust are in the record, provision being made for full control and management by the trustee of the trust estate, with power to invest and reinvest the property without limitation, or the necessity of a court order. In this connection, in the light of a subsequently noted contention of the Superintendent of Banks, it will be observed that the trustee was in no way limited in the purchase of securities and that such purchases could be made immediately without any necessity of outside approval or delay.

The securities involved are (in the order here considered) Land Trust Certificates of (1) Fort Hayes Improvement Co., Spring & Wall Sts., Columbus, Ohio, (2) Euclid "Y" Improvement Co., (3) Taylor Square Realty Co., (Euclid Ave., Taylor Rd.), (4) Chester-East 18th St. Realty Co., (5) Cleveland Hotel Building Site, (6) H. F. Neighbors Realty Co., (7) Michigan Office and Theatre Building Site, Detroit, Michigan.

Several of these issues possess certain common characteristics, which are important in view of the conflicting contentions advanced by the opposing parties.

The Probate Court, as previously stated, sustained exceptions as to all the issues noted. The Common Pleas Court of Cuyahoga County overruled exceptions as to No. 1 and No. 5.

Before proceeding to discuss the merits or demerits of the trustee's action in purchasing these securities for the trust, a preliminary question may be here disposed of.

It is the contention of the Superintendent of Banks that the Probate Court had no jurisdiction to hear the matters presented to it, and the Superintendent has devoted a somewhat lengthy brief to this position. It is not necessary to devote any appreciable space to a consideration of this question, although the attention given it in the brief noted and in others might seem to warrant such action. It is perfectly clear that the estate being administered in the Probate Court, the trustee's accounts being filed there, it was not the intention of the legislature in enacting appropriate legislation for the liquidation of banks and defin-

ing the duties of the Superintendent of Banks in reference thereto. to oust the jurisdiction of the Probate Court, and the consequent jurisdiction of the Common Pleas Court on appeal on law and fact, in the matter of exceptions to the accounts of trustees, even if such trustee was a bank in process of liquidation Jt will be noted that the conclusions herein reached are limited to a justification of only such ██ jurisdiction as is required to pass upon the exceptions to the accounts filed in the Probate Court and authorizes no action by the exceptors in the Probate Court, which would place them in any different position from any other creditor presenting his claim to the Common Pleas Court in the proceedings in liquidation, or any creditor invested with similar rights to those found to reside in the exceptors.

The Probate Court cannot make any effective order affecting the liquidation of the bank, but such court surely may determine whether or not ██ a trust has been legally administered, and by such determination create in the beneficiaries a secondary right to relief extended to any creditor under the general laws affecting all creditors. The fact that the right to exercise such right of a general creditor may be made optional is beside the point. The Probate Court possessed jurisdiction to determine whether or not there is existent a wrong or a violation of a primary right, the right to have the trustee administer the trust with loyalty and fidelity to the beneficiaries and the trustor. Its determination of the existence of such violation automatically under the law creates the secondary right to relief in the beneficiaries. The adjudication of matters involving such latter right, the proving of the claim, ██ the distribution of appropriate assets toward its liquidation, are matters involved in the liquidation of the bank and may be considered in other appropriate litigation.

Coming now to consider the exceptions:

It is not shown in the record that the trustee or its successor was ever guilty of the slightest fraud in the administration of the trust. The charges deal with self-dealing, and disloyalty to the trust, beneficiaries, and trustor. If such charges are borne out by the evidence, the exceptions must be sustained.

In a number of cases, the Bank acted as trustee for owners to whom loans were made by the bank after conveyance of the fee of the real estate involved to the bank. Certificates of trust were then issued by the Bank to the owner. There is nothing reprehensible in the Bank acting ██ both as trustee for the owner and trustee for the estate, so long as full loyalty to each trust is preserved. The mere existence of dual trusteeship is not sufficient to create self-dealing. **Ulmer v Fulton, Supt. of Banks, 129 Oh St 323,** has no application. In one case, at least, this Bank as trustee for an estate, sold to itself as trustee for another estate. It seems to be generally considered that this does not create such culpable conduct as to in itself constitute improper action or to violate the rule requiring loyalty and fair dealing. **Lima First American Trust Co., Trustee v Graham, et, 54 Oh Ap 85.** Barker v First National Bank of Birmingham, 20 Fed. Supp. 185 (D. C. Ala. 1937).

Certain profits were made by the Bank in connection with the handling of issues which were entirely taken up by the Bank (the first four). These profits simply amounted to compensation for trust services. They were designated as acceptance fees and annual fees. The income from the certificates was predicated upon the fixed rental paid by the original owner.

One who has the right to act as trustee for separate beneficiaries may certainly receive appropriate compensation from ██ each, if no advantage was taken of either. None was taken in

the instant case solely by █ reason of the acceptance or the annual fees received by the Bank.

The trustor was unquestionably familiar with the vast amount of trust business done by the Bank, and that by reason of its engagements it had a wide field of investments from which to choose. He placed unqualified and unlimited confidence in its integrity and ability. In exchange he had the right to expect loyalty to the trust and adherence to the law governing trusts. Such is the criterion for the examination in particular of the several investments involved. §10506-40 GC. However, as will later appear, it was not the mere fact that the Bank acted as trustee for the owner which rendered the position of the Bank untenable in passing the securities issued by it as such trustee to itself as trustee for the Binder estate. The justifiable criticism of the position of the Bank lies in the fact that the Bank became the **owner** of the certificates, and in a capacity wholly separate from that of trustee for the owner, it purchased the certificates from the one who was entitled to them. The purchase was made by paying the owner the face value of the certificates and the Bank then could either hold them as an investment or sell them to whom it chose. There are in the record letters indicating that it was the Bank's intention to sell these certificates to itself as trustee for the many trusts requiring securities for which it was trustee. Although the tenure of the Bank in the certificates was more or less temporary—still its ownership was unqualified in any respect.

A factor common to a number of issues may be helpfully considered at this point. The Bank, although a single corporation, had many departments, among which were the Trust Department, the Banking Department, the Bond Department, the Savings Account Department, the Mortgage Loan Department. Each of these was conducted under the management of a separate head, and in many respects the several departments were conducted toward each other as separate entities. Each, however, was a part of the single corporation, so that inter-relations might easily in view of trust obligations evolve into self-dealing. This is the contention as to a practice represented by what was designated in the Bank as Living Trust 1043—abbreviated to L. T. 1043. And the court here carefuly distinguishes this phase of the case from that involved in the purchase of the closed issues. It is asserted on behalf of the Bank that the trust needs of the vast quantity of trust estates handled by the bank could not be satisfied instanter. That in many cases court orders and various consents were necessary before the actual transfer of securities could be made to the individual trust involved. Such was **not** the case in the Binder trust. Because, however, of this general situation requiring delay in actual transfer, the Bank through its Trust Department acquired from time to time securities which it considered would be acceptable to trust estate needs. In some cases, these needs were anticipated, in others, acquisition of securities was made by the Bank upon requisition of the Trust Department for specific trusts. Pending the payment for securities, funds in the Bank's hands as trustee were intermingled █ in a general savings account. This is permitted by law. §710-164 GC. Payment for securities purchased by the Trust Department was made from the Savings Department. Thereafter, specific assignment of securities was made to individual trusts and the Savings Account records appropriately debited. Thus, in the Bank under a ledger head of L. T. 1043 there was created and maintained a pool of securities which was constantly being augmented and decreased as securities were purchased anticipating trust needs and allocation made to specific trusts.

In view of the fact that no fraud can be conceivably charged by reason of this practice and no slightest prejudice to the trusts suggested, the duty of the

court becomes merely one of passing upon the practice as being within the recognized limitations upon conduct proper in a trustee.

It is the serious and vigorous contention of the exceptors that this practice amounted to self-dealing, that the securities, until specific allocation was made, were, as was the case of the closed issues, the unlimited property of the Bank and could be fully dealt with as such. In this record there is nothing except the testimony of bank personnel, and the letters referred to supra, to indicate that such was not the case. No resolution binding upon the Bank is in evidence. The Stone cases, decided by Judges Montgomery, Sherick, and Lieghley (No. 17221, Eighth District Court of Appeals, opinion by Montgomery, J.) appear from the opinion to be capable of differentiation on this point. It is true the securities were isolated in the Bank's vaults, but still there is in this pool and other securities owned by the Bank and placed in its vaults, no distinguishing characteristic except that it is stated that the securities were obtained for the trusts. It is claimed by the Superintendent that the "class" of beneficiaries could enforce a trust upon the unallocated securities in the pool. The applicability of the authorities cited in support of this contention may be seriously doubted. In the absence of any definite, conclusive and binding limitation upon the securities pooled, completely depriving the Bank of a dispositive right over such securities to other grantees than trusts of the Bank then existent, such practice must be considered outside the limits placed by general acceptation upon trustees. It is difficult to see why such practice may not be considered self-dealing, and, consequently reprehensible, although it may be impossible to show that entire good faith has not been maintained.

A similar situation prevailed in the closed issues purchased by the Bank as an entirety, as has been before noted. The owner was paid the agreed value of the entire issue of land trust certificates. Again, the Bank's intention is stated to exist to divert the entire issue to the use of the trusts. Certificates were not issued until the particular trust was identified. Certificates were then issued directly to the Bank as trustee for the trust involved. Great weight is placed by the Superintendent and Amici Curiae upon this fact. No other practice, in any event, seems to be warranted, even if sale was to be made to others than the Bank as trustee, that is, to ordinary vendees. No limitation binding upon the Bank irrevocably requiring allocation to the trusts appears in the record. It is claimed the Bank only held a vehicular title. It held certainly an unlimited depository title, and, again, although no bad faith appears—the difference between this situation and any ordinary case of self-dealing is microscopic and purely visionary. If such practice shall be approved as to a bank dealing with millions of trust funds, then it must be approved as to any trustee dealing with a modest estate. Such, certainly, may not be the case. There can only be one rule as to the fiduciary conduct of a trustee, whether that trustee is in the business of acting as trustee and deals in millions, or is an isolated individual, administering a small trust.

It is the contention of the exceptors that in paying off certain mortgage loans held by the Bank, in clearing the title for the issuance of the land trust certificates, that the Bank permeated these certificates with a character of self-interest, which made them subject to attack when later transferred to itself as trustee for a specific trust. This contention fails in force and effect, when it appears that this action was wholly free from any fraud against, or prejudice to the beneficiaries, who later became related to the certificates involved.

Identifying the general observations, supra, with the specific issues involved —(No. 1) Fort Hayes Improvement Company. Regardless of other features, the record shows that the particular certificates involved were purchased by

the trustee, for the Binder trust from itself as trustee for another trust. This action, no fraud appearing as to either trust, has never been considered reprehensible.

(No. 2.) Euclid Y Improvement Company. This was an entire or closed issue, held for the trusts, allocation being made over a considerable period. The purchase by the Bank as trustee is subject to the charge of self-dealing, noted generally supra. The bank purchased the entire issue—it paid the owner for whom it was trustee the amount of the total value of the certificates. It could have sold them to anyone at anytime. Its representatives state now it intended to use the entire issue for the trusts, and that the title was merely a temporary or necessary expedient. However, the bank did unqualifiedly own these certificates and sold them to itself as trustee for the Binder estate.

(No. 3). Taylor Square. This issue was similar in character, as to creation and disposition, to No. 2. It is subject to the same criticism.

(No. 4.) Chester, East 18th St. This was an entire or closed issue, and in addition went through L. T. 1043. It is subject to both criticisms as hereinbefore noted.

(No. 5.) Cleveland Building Site. The Bank was the trustee for the owner of this issue. The entire issue was purchased by Tillotson & Wolcott, a brokerage firm in the City of Cleveland. The Bank later entered into a syndicate selling agreement with Tillotson & Wolcott, out of which it made a profit on each share in addition to an acceptance and annual fee incident to its trusteeship for the owner. The purchase of the certificates involved in this action was made however directly from Tillotson & Wolcott. The certificates involved were never owned after the original issue to Tillotson & Wolcott. The issue did not pass through L. T 1043. No criticism can be justly made of this purchase in the absence of a definite showing that the passage of title through Tillotson & Wolcott was a mere sham to cover a direct conveyance to the trust.

(No. 6.) Neighbors Realty Co. The Bank was trustee for this issue for the owner. The entire issue was underwritten by Otis & Company. No syndicate selling agreement with Otis & Company is in evidence. Purchase of the certificates in question was made from Otis & Company and held in L. T. 1043. The criticism as to self-dealing is applicable.

(No. 7.) Michigan Office & Theatre Building Site. The Bank was not owner trustee for this issue. It participated in a selling syndicate. The Bonding Department of the bank purchased the certificates involved, held title to the same and transferred title to itself as trustee for the Binder estate. The issue was purchased by one department of the bank from another. The entire bank as a unit was both vendor and trustee. The action involved is clear self-dealing, as was the case in the entire or closed issues and L. T. 1043.

It becomes now necessary to consider a case much relied upon by the Superintendent of Banks, and which seems to have had some weight in the consideration of the Stone case, supra. That case is **Stickle, Admr. v Guardian Trust Co., et, 133 Oh St 472.** The syllabus of the case comprehensively covers the matters considered in the opinion. It is:

"1. Where, under the then existing Ohio statutes, a trust company was appointed executor of an estate on February 10, 1932, and as such fiduciary on the same day deposited a sum of money in its own bank as a savings account, and thereafter such trust company became insolvent and on June 15, 1933, was closed for liquidation by the Superintendent of Banks and removed as executor by the Probate Court and thereafter was succeeded by S as administrator, who, under §710-92 GC, filed an action to establish a preference for the entire amount due on such savings account when the bank closed: HELD, as against general de-

positors, equity will not grant a preference to such claim, in the absence of tracing such deposit to a particular fund, even though the amount of cash in the bank from the time of such deposit until the closing of the institution was at all times greater than the amount due on such savings account when the bank closed, and even though the trust company, for a period of more than two years before its closing had committed wrongful acts for which it would be obliged to respond to such succeeding administrator.

"2. In respect to such a claim for preference, the real issue is not between the succeeding administrator and the Superintendent of Banks as liquidator of the trust company, out between the equities of the succeeding administrator and the general depositors."

It seems evident that this case can be of no service in assisting us in reaching a conclusion upon the real issues presented in the instant case. The Stickle case deals solely with the question of preference or lien of an admitted creditor. The Trust Company was admittedly a debtor to the Davey estate at the time it went into liquidation. In that case, it was sought to impress upon the assets of the Bank a lien in favor of the estate of Davey, simply because the bank, through its Trust Department, was administering such estate, and bore a fiduciary relationship to those interested in such estate.

The question presented to the Probate Court and the Court of Common Pleas on appeal in this case was whether the beneficiaries of the Binder trust should or should not be considered creditors of the Guardian Trust. In so far as such beneficiaries seek to go further along the line of preference, the Stickle case will be undoubtdly a complete negation of such effort. It is not necessary to here pass upon this question.

It has been developed in what has already been said that the Trust Company violated a cardinal principle applicable to and controlling all trustees, i. e., that such trustees as trustees shall not purchase from themselves as individuals. That this rule was violated in the instances noted seems clear beyond question. The rule does not require proof of fraud or evil intent. It is a rule devised for the protection of the trusting. It is as much a protection to the trustee as to the beneficiary, for if it be followed, even the suspicion of evil cannot be leveled at the trustee.

That by finding this rule to have been violated, the courts enlarge the pool of unsecured and unpreferred creditors, certainly may not be considered as any controlling factor in determining whether or not there has been a violation of the law applicable to trusts. This in no way is a case similar to the Stickle case, in which, as the Supreme Court found, the real issue was between the exceptors and the depositors. The beneficiaries in the instant case at all times had a primary right to have the trust in which they were interested administered according to law. When this right was violated, a secondary right was created—a right to relief. Before the violation of the trust, they were not creditors of the Trust Company. After the violation, they became optional creditors, that is they may either keep the securities purchased for them, or prove their claims for the value of the original sum invested, in the liquidation proceedings, subject to such orders as to the securities as the Court considering such liquidation proceedings shall make.

It is an inescapable conclusion, therefore, that the Common Pleas Court was correct in its findings and judgment in so far as it fixed the status of the exceptors as optional general creditors. In so far as it attempted to go further in determining matters which are proper for the consideration of the tribunal administering the assets of the Trust Company among the creditors of such institution, it went beyond the proper scope of this litigation. The Superintendent of Banks in this action may not be foreclosed from raising any proper question beyond the

conclusion that the exceptors have the right to the status of general creditors to the amount of the original trust investment, if they elect to occupy such status. This is the full extent to which the Courts hearing the instant action may go.

This conclusion is manifestly opposed to that reached by Montgomery, Sherick, and Lieghley, Judges in the Stone case, supra. The case should, therefore, be certified to the Supreme Court as the judgment entered herein will no doubt be in conflict with the judgment entered by those judges.

**HAMILTON, PJ., concurring:**

I concur in the conclusion reached by my associate, Judge Ross.

Equity looks to substance and not to form. It is conceded that self-dealing by a trustee with his trust invalidates the trust investment, at the option of the trustor or his beneficiaries. Confusion is created by the many departments of the bank involved in its trust transactions. The fact remains that some of the certificates involved were purchased by the trustee from pools which it owned entirely, or of which it was the partial owner. Some were created ab initio by the purchase of the land and the issuance of land trust certificates, which were then sold by the bank to itself as trustee of the estate involved, and a commission was charged by the bank for its services.

I am of the opinion that the rules of equity will not look upon such transactions as measuring up to the requirements of utmost good faith on the part of a trustee in handling the trust estate. To stamp the court's approval on the conduct of the trustee in the transactions involved would open the door to the point of jeopardizing trust investments generally and may not always be free from bad faith as in the case here.

The questions in the instant case have been discussed at length in the opinion of Judge Ross and in the dissenting opinion of Judge Matthews, and since the case is to be certified to the Supreme Court for final decision, I will

not discuss the questions involved further.

**MATTHEWS, J. (Dissenting):**

I am unable to concur in the conclusion reached by my associates in these appeals.

My dissent is not from any rule of law or principle of equity announced by them. The divergence arose when we attempted to apply those principles to the data relating to the transactions disclosed by the record.

That a trustee is required to exercise reasonable diligence and discretion in complete good faith with the single purpose of promoting the best interest of the trust is indisputable. The rule and the sound policy upon which it is based has not been questioned for centuries. Unless accepted standards of morality are completely obliterated, it can never be questioned. No court would question it or weaken it by giving to it a narrow application that would exclude a case that comes within the spirit of the rule, even though it might happen that it did not come within its letter.

Therefore, wherever it appears that a trustee has failed to exercise good faith, reasonable diligence or discretion, and the beneficiary of the trust is thereby injured, a court of equity will be quick to compel the trustee personally to suffer the loss and protect the trust estate.

So, also, if a trustee seeks to make a personal profit by reason of any act performed on behalf of the trust, the court will promptly prevent it by requiring him to account to the trust for the profit thus sought to be withheld, and this, without regard to whether such profit is hidden under the title of commission, bonus or premium, or any other designation applied to hide its relation to the trust estate.

To protect the trust estate from loss through failure of the trustee to exercise good faith, due diligence and discretion, and to take away from the trustee all profit that rightfully belongs to the beneficiary, every device of equity is available to the beneficiary. To pre-

vent loss on the one hand and profit on the other, the trustee can not sell his own property to the trust estate, or buy the trust property for himself. This is but a specific application of the general rule that no man can be an impartial judge in his own case. In selling to or buying from the trust estate, judgment and discretion must be exercised in determining the price to be paid. It requires the competition of the open market between buyers and sellers uncontrolled by one another. If a trustee attempts to perform the dual role of buyer-seller, the court will not attempt the task of the psychologist of determining whether in fact the trustee, contrary to the general rule of human nature, leaned in favor of the trust estate and against himself, but will hold that the two attitudes are inherently incompatible, and a purchase or sale made under such circumstances is not binding on the cestui que trust, unless and until he with full knowledge of the facts consents to it. This rule is predicated upon the conclusion based on experience that men generally prefer their own material advantage to that of another. The rule has no application where this element is lacking. It therefore does not preclude dealings between different trusts, although the same person is the trustee.

However, no court has ever held, so far as I am aware, that a trustee after investing trust funds, lawfully and prudently, must guarantee the continuance of the market level at which such funds were invested. The rule requiring good faith, reasonable diligence and discretion, and excluding the trustee from any personal profit, should not be so applied as to impose such a liability upon a blameless trustee.

Now, in this case, it is conceded that the Binder trustee acted in good faith, and that in selecting these land trust certificates, in which to invest trust funds, it exercised sound discretion. Land trust certificates were regarded generally as desirable property because they evidenced an interest in real estate, yielded a satisfactory return and were free of property tax. The legisla-

ture had specifically authorized such investment of trust funds. It is conceded that the amount paid for these land trust certificates was reasonable, that the market price at the time was equal to or exceeded the price paid, and continued to be equal to or in excess thereof for a long time thereafter.

So an attempt to impose a personal liability on the trustee and to impose a charge upon the fund in these cases because of mala fides or failure to exercise reasonable discretion in making the investment, must fail because there is no basis for it in the evidence. Indeed the majority opinion is not predicated upon any such theory. The conclusion in favor of the Binder beneficiary is reached solely by the application of the iron rule prohibiting the trustee from self-dealing with reference to the trust without, in my judgment, restricting the rule to the evil which it was intended to correct.

In a certain sense a trustee is always dealing with himself, in that he must exert whatever force of will is necessary to subordinate any tendency to take advantage of his position to serve a selfish purpose at the expense of the trust. That is simply the self-dealing or inner struggle that arises whenever circumstances present alternative courses between right and wrong. But that is not what is meant by self-dealing, as that term is used in relation to the conduct of trustees. In that connection it is limited to the transfer of the ownership of property of the trust to the person who is the trustee or the property of such person to the trust. It is the transfer of ownership from the individual to the trust or vice versa, that the rule prescribes.

In the instances in which The Guardian Trust Company performed the service of creating these land trust certificates and took the legal title of the real estate, in order to do so, it was not dealing with its own property. It did not own the real estate, the equitable title to which was divided into fractional units in order to make it available to others for investment. It is true that it was paid by the trustor for

its services in this connection, but that does not make the transaction a dealing in its own property. And if it should be required to account to the trust for the money received for such services, upon the theory that it was a bonus or commission received in connection with the trust fund investments, that is an entirely different thing from holding that it was dealing in its own property, and. therefore, the cestuis have a right to elect to affirm or disaffirm, and upon disaffirmance, the trustee must restore the trust fund to its status quo ante. The difference in the two transactions requires the application of entirely different rules. If these commissions were obtained as a result of investing trust funds, they should have been accounted for to the trusts and the trustee charged therewith. But this could only be done upon the theory that The Guardian Trust Company was acting for its various trusts from the inception of the transaction between it and the owners of the real estate. If it was so acting, its reasonable compensation for such services would be a credit justly chargeable against the trusts. As it is conceded, (or, at least the proof does not show the contrary) that the amount received by The Guardian Trust Company was not in excess of reasonable compensation, the debit and credit items would exactly balance. That result is the same as though both items were left out of the account.

Now was The Guardian Trust Company engaged in self-dealing with reference to the specific land trust certificates? These certificates were purchased from the trustors by The Guardian Trust Company. In what capacity did it purchase them? Were those purchases made in its individual capacity or as trustee? That is the question. While the law makes intent the test, it makes and can only make external manifestations the objects of its concern. Now what is the evidence of external manifestations of intent?

In the three instances of the so-called "closed" issues, the entire transactions were conducted by the trust department. This in and of itself would be evidence that they came within the domain of trusts. In each instance before any money was advanced, the purpose was expressly stated in a letter from the trust department to the bond department. In each instance it was stated in the letter that the trust department "had purchased for trust investment purposes" or "were puchasing for trust investment purposes". The certificates were ear-marked and were not commingled with the securities of which the bank was the beneficial owner. All these indicate that The Guardian Trust Company was acting in its capacity as a trust company and purchasing whole issues in which to invest trust funds. Binder trust funds were so invested and trust certificates thereby acquired by that estate.

Of course, The Guardian Trust Company, as a bank, had a claim or lien against the issues for any balance of its own money used in purchasing them, but that fact and the further fact that after the purchase, a small part of these certificates were sold to other than trust estates does not weaken the force of the conclusion to be drawn from the circumstances and declared purpose that accompanied the purchase.

That it is not sufficient to brand a trustee with self-dealing to merely point to the fact that in the process of acquiring title for the trust estate, the bare legal title has passed through the trustee's name without the trust capacity being disclosed in the conveyance is abundantly sustained by the authorities. In Matter of Keen's Estate, 306 Pa. 363, 159 Atl., 713; Dwight v Hazlett, 111 W. Va., 109, 161 S. E. 434; Roberts v Michigan Trust Co., 273 Mich. 91, 262 N. W. 744; Leathe v Title Guaranty Trust Co., 18 Fed. (2d) 41, cert. denied, 275 U. S. 535; Cox v Camden Safe Deposit & Trust Co., 2 Atl. (2d.) 473.

It is beneficial ownership inconsistent with any right in the trust estate that prevents the trustee as such from bargaining with himself for the transfer of that ownership to the trust estate.

What I have said with reference to the "closed" issues is applicable with greater force to the other certificates purchased by The Guardian Trust Company from others and issued directly to the Binder trust. As the title to these certificates was at no time in the name of The Guardian Trust Company prior to the time when they were conveyed to it as trustee eo nomine, for the Binder estate, there is no vestige of a basis for a claim of self-dealing. The fact that The Guardian Trust Company assisted in marketing the issue of which they were a part is beside the point, when considering the question of self-dealing. Whether it made a profit which it should have accounted for to the trust estate raises another issue, the decision of which, as already pointed out, is attended with other consequences determined by the application of other tests.

Before closing it should be said that it is manifest that the loss resulting from the depreciation of these land trust certificates was occasioned directly by the economic cataclysm through which this country has been passing, and has no relation either directly or remotely to the action of The Guardian Trust Company in acquiring them. Under such circumstances, law and equity concur in holding that the loss must stay where it falls, and that neither will assist in the effort to shift it to other shoulders. In this case, it would not be possible to shift it to the shoulders of the trustee except in a dry, legalistic sense, because the trustee was destroyed by the economic maelstrom. It would be possible only to shift the loss to the shoulders of the depositors. While this might be just and necessary to reimburse the trust estates for losses directly attributable to delinquencies by the trustee, those punitive measures exerted by courts of equity against such trustees should be withheld when they can only operate, if exercised, against depositors who are equally innocent. These considerations were pointed out in Stickle v Guardian Trust Co., 133 Oh St 472, and In The Matter of Ella M. Stone,

recently decided by the Court of Appeals of the Eighth Appellate District, the decision in which is in direct conflict with the conclusion of my associates.

I concur with my associates in certifying this case to the Supreme Court because of conflict with the judgment in the Ella M. Stone case.