UNION GUARDIAN TRUST CO. *v.* MARQUETTE PARK CO.

1. MORTGAGES—TRUST MORTGAGES—EXTENSION OF TIME—SURETY.

In the absence of a valid agreement between trustee under trust mortgage and nonassuming grantee of mortgagor's grantee extending the mortgage indebtedness and suspending the mortgagee's right to invoke the acceleration clause of the mortgage and its right to foreclose, the obligation of the mortgagor's grantee as either surety or *quasi* surety would not be altered and it would remain obligated for the mortgage debt.

2. SAME—EXTENSION OF TIME—DEPOSIT OF RENTS—RELEASE OF ASSUMING GRANTEE.

Letter from trustee under trust mortgage containing an assignment of rents and profits and an acceleration clause to nonassuming grantee of mortgagor's grantee then in default, which requested the deposit each month of net rents, to which the grantee made no reply other than by depositing net rents until foreclosure proceedings were commenced about six years later, during most of which period the mortgage was in default, *held*, not to have constituted an agreement extending the mortgage indebtedness or suspending the trustee's option right of invoking the acceleration clause so as to release mortgagor's grantee from obligation to pay the mortgage debt it had assumed and any deficiency resulting from foreclosure sale.

3. SAME—ACCELERATION CLAUSE—FORECLOSURE—LACHES.

The failure of a trustee under a trust mortgage to exercise its optional, permissive right to invoke acceleration clause and commence foreclosure upon default of nonassuming grantee of mortgagor's grantee for period of about six years during which time defaultor was depositing net rents of the property with mortgagee in period of economic depression *held*, not to constitute trustee guilty of laches under the existing conditions and relieve mortgagor's assuming grantee from liability.

Necessity that agreement to extend time between principal and creditor be a binding one to operate as a discharge of nonconsenting surety, see Restatement, Security, § 129 (1) and comment under 1 (c).

4. SAME—ACCELERATION CLAUSE—OPTION—DISCRETION OF TRUSTEE.
   When a trustee under a trust mortgage is given the option of
   invoking an acceleration clause, the exercise of some discretion
   on the part of the trustee is clearly contemplated.

5. EVIDENCE—JUDICIAL NOTICE—ECONOMIC DEPRESSION.
   The Supreme Court will take judicial notice of the so-called
   economic depression occurring in the fourth decade of the
   twentieth century.

Appeal from Wayne; Webster (Arthur), J. Submitted October 9, 1941. (Docket No. 20, Calendar No. 41,598.) Decided January 5, 1942.

Bill by Union Guardian Trust Company, a Michigan corporation, trustee, against Marquette Park Company, a Michigan corporation, and others to foreclose a mortgage and for deficiency decree. Decree for plaintiff. Defendant Marquette Park Company appeals. Affirmed.

*Henry J. Freud,* for appellant.

*Adrian D. Rosen,* for appellee.

STARR, J. Defendant Marquette Park Company appeals from foreclosure decree determining said defendant liable for mortgage indebtedness and deficiency resulting from foreclosure sale.

On December 1, 1927, Frank L. H. St. Amour and wife executed trust mortgage to the Guaranty Trust Company of Detroit, as trustee, covering property located at 14500–14502 East Jefferson avenue, Detroit, together with rents and profits therefrom. Such trust mortgage was given to secure an indebtedness of $60,000, represented by six per cent. first mortgage bonds executed by the St. Amours and maturing serially, $3,000 on December 1, 1928, and on December 1st of each year thereafter until Decem-

ber 1, 1937, when the balance of $33,000 became due. The trust mortgage was duly recorded; the mortgage tax paid; the bonds qualified for sale and sold. Plaintiff, Union Guardian Trust Company, was subsequently appointed successor trustee under such mortgage.

On April 9, 1928, the St. Amours, mortgagors, conveyed the property by deed to defendant Marquette Park Company, a Michigan corporation, which assumed and agreed to pay the mortgage indebtedness. On May 28, 1928, the Marquette Park Company conveyed the property by deed to defendant Freada E. Ullman, who took subject to the mortgage indebtedness, but did not assume and agree to pay the same. The trust mortgage contained acceleration provision, reading, in part, as follows:

"Should default be made in the payment of any of the principal or interest specified in said bonds or coupons, secured by this mortgage, or in the due observance and performance of any other covenant, agreement, provision or condition herein required to be kept or performed by said mortgagor, and should such default continue for a period of 30 days, the whole principal sum of said bonds, together with all arrearage of interest thereon, shall, at the option of said trustee, and without notice, become and be due and payable immediately thereafter, although the period above limited for the payment thereof may not then have expired, anything herein or in said bonds contained, to the contrary notwithstanding. The commencement by said trustee of proceedings to foreclose this mortgage in any manner authorized by law, shall be deemed an exercise of said option."

There was default in payment of the bonds maturing December 1, 1931; and on December 31, 1931,

plaintiff wrote defendant Ullman the following letter:

"Mrs. Freada E. Ullman,
"C/o J. L. Freud,
"835 Penobscot Bldg.,
"Detroit, Michigan.

"Re: Guaranty Trust Loan #1100
"*Dear Madam:* 14500 East Jefferson Avenue

"After a conversation with your representative, Mr. J. L. Freud, we offer the following proposal in connection with curing the default under your bond issue:

"At present your default consists of nonpayment of $3,000 in bonds maturing December 1, 1931. In order to properly protect the interest of the bondholders we feel it necessary to request that you deposit with us each month the net rents from the property after payment of the necessary operating expenses. Under the terms of the trust mortgage, we are given the right to proceed to collect all rents from the property, however, we feel that any legal action in this regard would tend to disturb the tenants and might create an unsatisfactory condition. We believe that an arrangement as outlined above would be satisfactory to the holders of defaulted bonds and should be equitable to all concerned.

"Please let us hear from you immediately as to your approval of this plan.

"Yours very truly,
"CHAS. R. DUNN,
"Executive Vice-President."

In pursuance of such letter Mrs. Ullman, who was in possession of the property, deposited $500 with plaintiff trustee on January 12, 1932, and on or prior to February 5, 1932, deposited with plaintiff, apparently from rents collected, sufficient additional funds to cure the default of December 1, 1931. Mrs. Ullman thereafter continued to deposit

with plaintiff the net rentals from the property. Defendant Marquette Park Company was not a party to such rent deposit arrangement between plaintiff and Mrs. Ullman.

There was default in payment of the bonds maturing in 1932 and each year thereafter. No notice of such defaults was given defendant company until after foreclosure proceedings were instituted March 18, 1938, by plaintiff at the request of a bondholder.

The bill of complaint alleged there was due on outstanding bonds the principal amount of $48,000, together with interest of $17,513.58, and Federal tax of $234, making a total of $65,747.58, and sought foreclosure of the mortgage and deficiency decree against defendant Marquette Park Company. Freada E. Ullman, the Marquette Park Company, and Arundel B. Wigle, land-contract purchaser of the property, were made parties defendant. The record indicates that the original mortgagors, St. Amour and wife, had died prior to the foreclosure. So far as the record shows, defendants Ullman and Wigle did not enter appearance.

On August 8, 1938, defendant Marquette Park Company filed answer, generally leaving plaintiff to its proofs, and on December 8, 1939, filed amended answer which raises the principal questions in this case. The amended answer states, in part:

"(1) That on or about May 28, 1928, this defendant conveyed said mortgaged premises to Freada M. Ullman; that on or about December 31, 1931 [date of above-quoted letter], said plaintiff and said Freada E. Ullman entered into a valid agreement extending the time of payment of said mortgage without the knowledge or consent of this defendant. In the event it be determined that, as

alleged in plaintiff's bill of complaint, said Freada E. Ullman assumed and agreed to pay said mortgage, said extension agreement hereinbefore referred to has released this defendant of and from any personal liability on said mortgage.

"(2) That if it be determined Freada E. Ullman did not, in the grant to her, assume the mortgage, the effect of her said extension agreement with said plaintiff would be the same as set forth in the preceding paragraph of this amendment or, in the alternative, as follows:

"(A) As between said plaintiff and this defendant, said plaintiff is precluded, estopped and barred from claiming interest coming due subsequent to the date of the extension agreement to be a part of the mortgage debt.

"(B) Said plaintiff, by reason of said extension agreement, took the land as its sole security to the extent of its value as of the date of the extension agreement, which value was greater than the amount of the mortgage debt, and this defendant was released of personal liability on said mortgage.

"(3) That said plaintiff has frequently granted extensions of the payment of the mortgage debt to said Freada E. Ullman without the knowledge or consent of this defendant and has never notified this defendant of the fact that said mortgage was in default; that by its conduct and silence, said plaintiff has induced this defendant to believe that it was unnecessary to protect itself by resorting to its right of subrogation; that if said plaintiff had promptly instituted foreclosure proceedings at the time said mortgage was first in default, this defendant would have fully been able to protect itself, but is now unable so to do; that the silence and conduct of said plaintiff constitutes laches, and it is thereby barred and estopped from now claiming that this defendant is personally liable on said mortgage.

Dated: December 6, 1939."

Plaintiff filed reply denying the allegations of defendant company's amended answer. The case was referred to a circuit court commissioner to take proofs. Plaintiff's representative testified as follows regarding the above-quoted letter of December 31, 1931, to Mrs. Ullman, and regarding deposit of rents:

"*Witness* (continuing): We did not get a reply to that letter in writing from Mrs. Ullman. At the time the letter, defendant's Exhibit 1, was written, on December 31, 1931, there was a default in payment of this mortgage to the extent of $3,000 in bonds maturing December 1, 1931. At that date, December 31, 1931, according to our records, Freada Ullman was in actual possession of the premises covered by the mortgage. The Union Guardian Trust Company was not in possession. According to our records, the last contract purchaser was collecting the rents. Union Guardian Trust Company was not collecting the rents. Mrs. Ullman acknowledged that letter by depositing on January 12, 1932, the amount of $500 with the Union Guardian Trust Company, trustee. That $500 applied on the coupons due December 31, 1931. The $3,000 default that I just spoke of was cured on February 5th. Mrs. Ullman complied with the arrangement set forth in the letter, defendant's Exhibit 1.

"*Q*. And commencing with that date Mrs. Ullman deposited with you the collection of rents from the property?

"*A*. Substantially, yes.

"*Q*. Prior to December 31, 1931, you didn't get as such, the rents from the property.

"*A*. The Union Guardian Trust Company didn't.

"*Q*. But you did after this letter. What date was that $3,000 default cured, on December 31, 1931, cured?

"*A.* That was cured by deposit on [of?] funds made on February 5, 1932. From the date of this letter (defendant's Exhibit 1) until the date the default was cured, no action was instituted to foreclose this mortgage. No action at all was commenced to collect the bonds. I do not know the amount of the rents that the property was paying from December 31, 1931, until February 5, 1932, but the deposit amounted to, for that period, $2,200. The $2,200 deposited during that period of time apparently represented rents during that period. We do not have in our files or any other place any agreement between Marquette Park Company or Union Guardian Trust Company or Mrs. Ullman by which Marquette Park Company became a party to this rent deposit arrangement specified in the letter of December 31, 1931, defendant's Exhibit 1. We have no record of Marquette Park Company entering into that. * * *

"The next default after December 31, 1931, under this mortgage, occurred with the nonpayment of the coupons due June 1, 1933.

"*Q.* Now then you have already testified that as a result of this letter of December 31, 1931, this arrangement was made by which income was paid to the trust company. Did that arrangement continue?

"*A.* Yes.

"*Q.* You have been in possession ever since?

"*A.* That is right. * * *

"*Q.* If it were not for the fact that the trust company had made this agreement expressed in the letter to Mrs. Ullman, defendant's Exhibit 1, would not the plaintiff, the trust company, then and there have declared the entire amount secured by the mortgage to be due and have instituted then and there proper proceedings at law or equity to assert and protect its rights? * * *

"*A.* As long as we were receiving the net income we wouldn't ordinarily serve a notice of default.

"*Q.* You were receiving by virtue of the arrangement with Mrs. Ullman, that's true, isn't it?

"*A.* That is true."

There is testimony that the property was assessed for $65,730 in 1931. Witness for defendant testified that, in his opinion, the "value of the property on or about December 31, 1931, was considerably in excess of $100,000." A witness for plaintiff testified that in August, 1938, the property was worth $35,000.

The commissioner filed report of findings of fact and conclusions of law, to which defendant company filed exceptions. The opinion of the court for confirmation of the commissioner's report provided, in part:

"The Marquette Company contends that it is released from liability because its grantee, then in possession of the premises, was granted an extension after default and without notice to the Marquette Company; that had foreclosure proceeded at that time, the premises would have sold for more on foreclosure; and the defendant company consequently cannot be held for any deficiency.

"The Marquette Company assumed the payment of the mortgage but its grantee, defendant Ullman, did not. On December 1, 1931, the grantee was in default to the extent of a principal payment of $3,000, and in connection with this default, plaintiff wrote a letter which is the foundation of the Marquette Company's claim that it has been released. The letter is dated December 31, 1931, and reads as follows: * * * [above quoted].

"Counsel for defendants continually refer to this letter as an extension agreement. It does not purport to be such on its face, but rather an effort to cure the default then existing, and it is significant that by reason of the deposit of rentals, this default was cured in a few months.

"At this stage the Marquette Company could not claim to be released from its obligation to pay the mortgage merely because plaintiff brought the mortgage into good standing rather than foreclose and sell. But after the default had been cured, the defendant Ullman continued to deposit the rents, and subsequently became again in default.

"When such subsequent defaults occurred the plaintiff might have declared the whole amount due and have begun foreclosure. Apparently the failure to act in this manner is the real substance of the complaint on the part of the Marquette Company.

"In the light of subsequent conditions in the real estate market, perhaps the plaintiff would have been wise to have foreclosed at once. But the right to declare the whole amount due was an option belonging to plaintiff, and the Marquette Company cannot complain of a failure to exercise the option.

"Nor can the plaintiff's efforts to collect on the mortgage rather than foreclose at the first opportunity avail the Marquette Company as a release of liability."

The decree entered October 25, 1940, confirmed the commissioner's report; provided for foreclosure and sale of the property; determined the mortgage debt to be $69,385.67, plus interest, and the present value of the property to be $35,000; and decreed defendant Marquette Park Company personally liable for the amount due on the mortgage and for any deficiency resulting from mortgage sale. The decree did not provide for deficiency against defendants Ullman and Wigle.

Defendant Marquette Park Company appeals, and its contentions are summarized in counsel's brief, as follows:

"1. It should have been found that a valid extension agreement, based on good consideration, was entered into between plaintiff and defendant

Ullman on December 31, 1931, without the knowledge or consent of Marquette, and was performed to the date of institution of this action on March 18, 1938, six days prior to March 24, 1938, when Marquette was first given notice of any default in payment of the mortgage.

"2. It should have been found that on said December 31, 1931, the date that plaintiff had the right to declare the entire then mortgage debt of $51,000 entirely due, and institute foreclosure, the mortgage security was worth approximately twice the amount of the mortgage debt. That by reason of said extension agreement with defendant Ullman, plaintiff then and there took the mortgaged property as its sole security for the debt and released Marquette to the extent of the value of the land as of said December 31, 1931.

"3. It should have been found that through its dealings with said Ullman, plaintiff suffered the mortgage debt of $51,000 existing on said December 31, 1931, to increase to $69,385.67, when foreclosure was finally instituted on March 18, 1938, through accumulation of interest and taxes; and plaintiff suffered the value of the mortgaged security to depreciate from twice the amount of the mortgage debt existing when plaintiff's right to foreclose first accrued to a point where it was worth about one-half of the mortgage debt, thus giving rise to a prospective deficiency of some $35,000. That by said dealings with said defendant Ullman, its long silence amounting to laches, and its course of conduct in the premises, plaintiff is estopped from asserting that Marquette is liable to pay the mortgage debt or any deficiency resulting from sale of the security pursuant to the decree in this cause."

Defendant company's first contention is based upon the theory that, when it conveyed the mortgaged property to Mrs. Ullman, who took subject to, but did not assume, the mortgage debt, it became a *quasi* surety to the extent of the value of

the property at the time of the alleged extension agreement on December 31, 1931; that the land became a primary fund for payment of the mortgage debt; that plaintiff and Mrs. Ullman, by entering into the alleged extension agreement, altered the obligation of *quasi* suretyship which the defendant company had assumed when it conveyed the property to Mrs. Ullman; that such alleged extension agreement between plaintiff and Mrs. Ullman, under the principles of suretyship, discharged defendant company from liability on the mortgage to the extent of the value of the property at the time such agreement was made.

Counsel for defendant company states in his brief:

"Most courts make a fundamental distinction between a situation where a mortgagee gives an extension to a grantee who has assumed and agreed to pay the mortgage, and where the mortgagee gives an extension to a nonassuming grantee who has taken only subject to the mortgage. In the cases where the grantee has assumed the mortgage, it has often been said that he becomes the principal obligor, and his grantor becomes a surety so that impairment of the contract by extension given by the creditor releases the grantor under familiar principles of suretyship. On the other hand, as here, where the grantee has not assumed the mortgage debt, no strict relation of principal and surety can be said to arise since there is no obligation of the grantee to pay the mortgage debt. Hence, a doctrine of *quasi* suretyship has been developed, granting full, practical relief to the *quasi* surety."

Defendant company relies upon the case of *Murray* v. *Marshall*, 94 N. Y. 611, 615, 616, in which the court said:

"When the mortgagor in this case sold expressly subject to the mortgage, remaining liable upon

his bond, he had a right as against his grantee to
require that the land should first be exhausted in
the payment of the debt. Presumably the amount
of the mortgage was deducted from the purchase-
price, or at least the transfer was made and ac-
cepted in view of the mortgage lien. Seller and
buyer both acted upon the understanding that the
land bound for the debt should pay the debt as far
as it would go, and their contract necessarily im-
plied that agreement. Through the right of subro-
gation the vendor could secure his safety, and that
right could not be invaded with impunity. It was
invaded. When the creditor extended the time of
payment by a valid agreement with the grantee, he
at once, for the time being, took away the vendor's
original right of subrogation. He suspended its
operation beyond the terms of the mortgage. He
put upon the mortgagor a new risk not contem-
plated, and never consented to. The value of the
land, and so the amount to go in exoneration of the
bond, might prove to be very much less at the end
of the extended period than at the original matu-
rity of the debt, and the latter might be increased
by an accumulation of interest. The creditor had
no right thus to modify or destroy the original
right of subrogation. What he did was a conscious
violation of this right, for the fact that he dealt
with the grantee for an extension of the mortgage
shows that he knew of the conveyance, and that it
left the land bound in the hands of the grantee.
Knowing this he is chargeable with knowledge of
the mortgagor's equitable rights, and meddled with
them at his peril. But it does not follow that the
vendor was thereby wholly discharged. The
grantee stood in the *quasi* relation of principal
debtor only in respect to the land as the primary
fund, and to the extent of the value of the land.
If that value was less than the mortgage debt, as
to the balance he owed no duty or obligation what-
ever, and as to that the mortgagor stood to the end,
as he was at the beginning, the sole principal

debtor. From any such balance he was not discharged, and as to that no right of his was in any manner disturbed. The measure of his injury was his right of subrogation, and that necessarily was bounded by the value of the land."

Other authorities cited by defendant company are: 41 A. L. R. 294, 295; *Kazunas* v. *Wright,* 286 Ill. App. 554 (4 N. E. [2d] 118); *White* v. *Augello,* 142 Misc. 233 (254 N. Y. Supp. 228); *Zastrow* v. *Knight,* 56 S. D. 554 (229 N. W. 925, 72 A. L. R. 379); *Wittson* v. *Englewood Plumbing Supply Company, Inc.,* 121 N. J. Eq. 323 (189 Atl. 920); *North End Savings Bank* v. *Snow,* 197 Mass. 339 (83 N. E. 1099, 125 Am. St. Rep. 368).

The contention of defendant company that the alleged extension agreement between plaintiff and Mrs. Ullman released and discharged defendant from its assumed liability to pay the mortgage indebtedness is based upon the premise that a valid extension agreement was made. If there was no valid agreement extending the mortgage indebtedness and suspending plaintiff's right to invoke the acceleration clause of the mortgage and its right to foreclose, then defendant company's obligation as either surety or *quasi* surety was not altered, and it would remain obligated for the mortgage debt. Defendant company argues that plaintiff's letter to Mrs. Ullman, together with the deposit of rentals for several years thereafter as contemplated by such letter, constituted a valid agreement extending the mortgage debt and suspending plaintiff's rights to invoke acceleration and to foreclose.

The question as to whether or not there was a valid extension agreement must be determined from the terms of the above-mentioned letter, the terms of the trust mortgage, and the dealings be-

tween plaintiff and Mrs. Ullman, the nonassuming grantee.

The letter of December 31, 1931, was apparently written by plaintiff in pursuance of a conversation with J. L. Freud, representing Mrs. Ullman, regarding the default in payment of bonds maturing December 1, 1931. Plaintiff's letter submits a "proposal in connection with curing the default under your bond issue." The letter then requests Mrs. Ullman to deposit with plaintiff each month the net rents from the property. It mentions that plaintiff, under the terms of the trust mortgage, had the right to collect the rents, but that "any legal action in this regard would tend to disturb the tenants;" that plaintiff believed such an arrangement for deposit of net rents would be satisfactory to holders of the defaulted bonds and "should be equitable to all concerned." In pursuance of such letter Mrs. Ullman deposited sufficient funds to cure the default of December 1, 1931, and thereafter continued to deposit the net rents with plaintiff.

Under the trust mortgage plaintiff had the right to collect the rents from the property. The mortgage provided, in part:

"As further security for the payment of said indebtedness, * * * the said mortgagor hereby sells, assigns, sets over, and transfers to said trustee, all such rents and profits and arrears of rent * * * as then are or may thereafter be or become due or owing to said mortgagor * * * from the tenants * * * which assignment of rents and profits shall run with the land and shall be good and valid as against the mortgagor or those claiming under or through him * * * said trustee may proceed by suit or suits at law or otherwise for the recovery thereof, as it shall deem advisable."

It is clear that plaintiff, by requesting Mrs. Ullman to deposit the net rents from the property, was only exercising its rights under the trust mortgage. Plaintiff was endeavoring to cure the then existing default of December 1, 1931, and to protect bondholders by obtaining deposit of the rents.

Plaintiff's letter did not offer to extend the mortgage indebtedness nor to suspend its option right to invoke the acceleration clause of the mortgage or its right to begin foreclosure. Since plaintiff did not offer to forego its rights under the mortgage, there could have been no acceptance by Mrs. Ullman which would create a valid extension agreement. The fact of forbearance by plaintiff cannot be construed as an agreement to forbear. The letter contained no provision which would have prevented plaintiff from invoking the acceleration clause of the mortgage or which would have prevented it from beginning foreclosure at any time during default. To be discharged from its assumed liability for the mortgage indebtedness, defendant company must establish that a valid and binding extension agreement existed between plaintiff mortgagee and the nonassuming grantee, Mrs. Ullman. *Marshall & Ilsley Bank* v. *Mooney,* 205 Mich. 513; *Dedrick* v. *Den Bleyker,* 85 Mich. 475; *Case* v. *O'Brien,* 66 Mich. 289; *Hayes* v. *Knox,* 41 Mich. 529; *Davis* v. *Rider,* 5 Mich. 423; Stearns' Law of Suretyship (4th Ed.), §§ 81, 82; Spencer on Suretyship (1913), § 224. The authorities cited by defendant company's counsel recognize the rule that a valid extension agreement must exist before the assuming grantee, as surety or *quasi* surety, is discharged.

We conclude that there was no valid extension agreement between plaintiff and the nonassuming grantee, Mrs. Ullman, and, therefore, the obliga-

tion of defendant company, as either surety or *quasi* surety, was not altered, and such defendant continued liable for the assumed mortgage indebtedness and any deficiency resulting from foreclosure sale.

Defendant company further contends that, even though no valid extension agreement existed, plaintiff's failure to invoke the acceleration clause sooner, to begin foreclosure, and to notify defendant company of defaults constituted laches, which estopped it from asserting that defendant company was liable for the mortgage debt or any deficiency.

The acceleration clause (above quoted) of the mortgage provided that, should. default be made in the payment of principal or interest, and should such default continue for a period of 30 days, "the whole principal sum of said bonds, together with all arrearage of interest thereon, *shall, at the option of said trustee,* and without notice, become and be due and payable immediately thereafter." Defendant company assumed the mortgage and was bound by all its terms and provisions. The mortgage imposed no obligation on plaintiff as trustee to invoke the acceleration clause and begin foreclosure when the first default occurred in 1931, nor when any subsequent default occurred prior to the final due date of the mortgage. The optional right to invoke the acceleration clause of the mortgage was for plaintiff's benefit and was a permissive right. *Lowenstein* v. *Phelan,* 17 Neb. 429 (22 N. W. 561); *Peyton* v. *Peyton,* 28 Wash. 278 (68 Pac. 757); *Hewitt* v. *Dean,* 91 Cal. 5 (27 Pac. 423); *Collins* v. *Nagel,* 200 Iowa, 562 (203 N. W. 702); *Watson* v. *Clayton,* 230 Ala. 59 (159 South. 481).

The words, "at the option of said trustee," clearly contemplated the exercise of some discretion

by plaintiff trustee. Plaintiff, at the time of the first default in 1931 and subsequent defaults, apparently determined that it was good judgment, and for the protection of bondholders, to accept the deposit of rents collected, rather than to invoke the acceleration clause and begin foreclosure. The defaults occurred during the so-called economic depression, of which we have taken judicial notice. *MacNear* v. *Malow,* 282 Mich. 239; *Hilliard* v. *Schram,* 285 Mich. 686; *Frey* v. *Farmers & Mechanics Bank,* 273 Mich. 284. In view of the terms of the mortgage, we cannot say that plaintiff was not justified in the course it followed.

We cannot overlook the fact that defendant company had assumed and agreed to pay the mortgage debt and could have, at any time, protected itself by paying such debt. There is no testimony that at any time prior to foreclosure defendant company objected to the methods employed by plaintiff, and it might, with some force, be argued that defendant impliedly acquiesced in plaintiff's method of handling the situation. There was no legal obligation on plaintiff to notify defendant company of each and all of its acts and doings as trustee, so long as it did not, by valid extension agreement or otherwise, affect defendant company's rights. Under the existing conditions and circumstances plaintiff was not guilty of laches in failing to invoke the acceleration clause of the mortgage sooner and begin foreclosure.

We find no valid reason for releasing defendant company from the obligation which it expressly assumed.

The decree of foreclosure determining defendant Marquette Park Company to be personally liable for the mortgage indebtedness and for any defi-

ciency resulting from the foreclosure sale is hereby affirmed, with costs to plaintiff.

CHANDLER, C. J., and BOYLES, NORTH, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.