BACON v. KENT-OTTAWA METROPOLITAN WATER
AUTHORITY.

1. CONSTITUTIONAL LAW—CONSTRUCTION OF TAX LIMITATION AMEND-
MENT.
   The 15-mill tax-limitation amendment to the Constitution ex-
   presses a limitation of the legislative as well as local power
   of taxation (Const 1908, art 10, § 21, as added in 1932 and
   amended in 1948).

2. EVIDENCE—JUDICIAL NOTICE—ECONOMIC DEPRESSION.
   Judicial notice is taken of the widespread economic depression
   endured during 1932 when the 15-mill tax-limitation amend-
   ment to the Constitution was proposed and adopted (Const
   1908, art 10, § 21, as added in 1932 and amended in 1948).

3. CONSTITUTIONAL LAW—CONSTRUCTION OF AMENDMENT—TAX LIMI-
TATION.
   The intent of the 15-mill tax-limitation amendment to the Con-
   stitution was to impose a general limitation upon the exercise
   of the State's power to tax property, the evil or abuse sought
   to be remedied being excessive taxation imposed by govern-
   mental agencies without the consent of those burdened (Const
   1908, art 10, § 21, as added in 1932 and amended in 1948).

4. SAME—LEGISLATURE.
   The legislature may not repeal a duly-voted provision of the Con-
   stitution.

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 3]  51 Am Jur, Taxation § 156 et seq.
[2]  20 Am Jur, Evidence § 120.
[4]  11 Am Jur, Constitutional Law § 4.
[5]  11 Am Jur, Constitutional Law § 61.
[6]  11 Am Jur, Constitutional Law § 39.
[7, 8]  37 Am Jur, Municipal Corporations § 3; 51 Am Jur, Tax-
   ation § 565.
   What is municipal corporation within constitutional or statutory
   tax exemption provisions.   108 ALR 577.
[9]  38 Am Jur, Municipal Corporations § 408 et seq.
[10]  2 Am Jur, Appeal and Error § 13.

5. SAME—CONSTRUCTION—INTENT.
   The object of construction, as applied to a written constitution, is to ascertain and give effect to the intent of the people in adopting it.

6. SAME—PRESUMPTION AS TO KNOWLEDGE OF EXISTING LAW.
   The framers of a constitution are presumed to have a knowledge of existing laws and to act in reference to that knowledge.

7. SAME—CONSTRUCTION OF AMENDMENT—TAX LIMITATION—MUNICI-PAL CORPORATIONS.
   "Municipal corporations," as the term was fixed by custom and subsequent judicial decision in excepting clause of 15-mill tax-limitation amendment to the Constitution, includes incorporated villages, fourth-class cities, home-rule cities, charter townships and school districts (Const 1908, art 10, § 21, as added in 1932 and amended in 1948).

8. MUNICIPAL CORPORATIONS—WATER AUTHORITY—TAX LIMITATION—CONSTITUTIONAL LAW.
   Water authority, organized pursuant to statute providing method of financing water supply system for area consisting of several incorporated cities and townships as local component units, was not a municipal corporation included within exception of the 15-mill tax-limitation amendment to the Constitution, hence, such portions of the territory as were otherwise subject to the limitation were not removed from its operation by act providing the authority with power to tax property "unlimited as to rate or amount," such quoted provision being unconstitutional (Const 1908, art 10, § 21, as added in 1932 and amended in 1948; PA 1957, No 4, §§ 16, 18).

9. CONSTITUTIONAL LAW—TAX LIMITATION—EVASION BY SUBTERFUGE.
   Attempts to evade tax-limitation provisions in Constitution by subterfuge are universally frowned upon even though the motive for doing so is worthy (Const 1908, art 10, § 21, as added in 1932 and amended in 1948).

10. APPEAL AND ERROR—QUESTIONS REVIEWABLE—WATER AUTHORITY—CONSTITUTIONAL LAW.
    Determination of whether or not water authority act provision for payment of water rates by the constituent municipal corporation from revenues not earmarked for other purposes violates the uniformity clause of the Constitution *held*, unnecessary, where provision of same act permitting imposition of taxes "unlimited as to rate or amount" is held unconstitutional (PA 1957, No 4, §§ 16, 18, 19).

11. COSTS—CONSTITUTIONAL LAW—TAXATION.

> No costs are allowed in suit wherein provisions of water authority
> act relating to imposition of taxes are held unconstitutional
> (Const 1908, art 10, § 21, as added in 1932 and amended in
> 1948; PA 1957, §§ 16, 18).

Appeal from Kent; Verdier (Leonard D), J. Submitted June 17, 1958. (Docket No. 57, Calendar No. 47,806.) Decided October 13, 1958. Rehearing denied December 2, 1958.

Bill by Carter Bacon, a taxpayer, against Kent-Ottawa Metropolitan Water Authority to enjoin, as violative of constitutional 15-mill restriction, development of a water-supply system to be financed by general obligation bonds. City of East Grand Rapids intervened as party plaintiff. Bill dismissed. Plaintiff and intervening plaintiff appeal. Reversed and remanded for entry of decree.

*Vander Veen, Freihofer, Cook & Bryant* (*Stephen A. Bryant,* of counsel), for plaintiffs.

*Varnum, Riddering, Wierengo & Christenson* (*Clifford C. Christenson* and *Eugene Alkema,* of counsel) and *Miller, Canfield, Paddock & Stone* (*John H. Nunneley* and *Stratton S. Brown,* of counsel), for defendant.

BLACK, J. This bill, in essence one for declaratory relief, was filed in the Kent circuit. The plaintiff, Carter Bacon, is a taxpayer of the city of East Grand Rapids. The city of East Grand Rapids, by petition for and duly authorized intervention, supports plaintiff's bill and prays for the same relief; that of enjoining defendant permanently from pursuit of resolved proceedings which, if valid, are made so by PA 1957, No 4 (CL 1948, § 121.1 *et seq.* [Stat Ann

1958 Rev § 5.2533(31) *et seq.*]).* The bill, following due hearing below, was dismissed. Plaintiff, and the named intervenor, appeal from the decree of dismissal.

---

* Act No 4 was conceived and designed, by the herein identified local units of government, to provide new methods of financing a proposed area-wide public water-supply system. In its brief the defendant authority relates, as follows, the legal and political history of the act:

"In view of the urgent need for water and the impossibility of obtaining water from the city [of Grand Rapids], and with the realization that this problem would only become more critical in the future as development continues, representatives of these various municipalities [referring here to the local units which, joining under said Act No 4, have now incorporated the defendant authority] began discussing the common problem as early as 1953. As a result of these discussions and a preliminary engineering survey, a water authority was formed under the provisions of PA 1952, No 196 (CLS 1956, § 124.251 *et seq.*, Stat Ann 1958 Rev § 5.2533 [1] *et seq.*). That authority then joined with the city of Grand Rapids and the Grand Rapids chamber of commerce to retain the consulting engineering firm of Black & Veatch of Kansas City, Missouri, to make an overall survey of the water needs of the metropolitan area. This survey concluded that existing supply facilities were inadequate for the then maximum day demands, to say nothing of expected future needs, and set out in general terms a program for the construction of facilities deemed adequate to meet the estimated needs of the metropolitan area until the year 2000.

"Further study showed that proceedings under Act No 196, would be futile. In the meantime PA 1955, No 233 (CLS 1956, § 124.281 *et seq.*, Stat Ann 1958 Rev § 5.2769 [51] *et seq.*), had been adopted and a series of meetings were held to incorporate an authority under that act which would include the city of Grand Rapids. Basically Act No 233 authorizes the incorporation of an authority with power to issue bonds to finance a water-supply system. Each member municipality would then contract to purchase water from this authority and pledge its full faith and credit to pay its share of the cost of the project. After further study it was concluded that this was not a feasible method of financing because several townships would become members and they would be subject to the constitutional 15-mill limitation. This would in the opinion of the authority's financial advisors, either make the bonds completely unmarketable or else result in a prohibitive interest rate because of the risk that these townships would not be able to meet their obligations within their 15-mill limitation.

"After further consideration it was concluded that existing methods of financing the construction of a facility of the size required to serve the entire area were not adequate because of the complexities resulting from the necessary inclusion of both townships and cities. As a result, after careful and thorough study, PA 1957, No 4 was proposed to and adopted by the legislature and signed by the Governor."

The defendant Kent-Ottawa Metropolitan Water Authority was organized as a "municipal corporation" under the provisions of said Act No 4. The city of Zeeland, the city of Hudsonville, the city of Grandville, the city of East Grand Rapids, the Ottawa county township of Georgetown and the Kent county townships of Wyoming and Paris, compose—under section 2 of the act—the incorporating local units. Following such incorporation due proceedings under the act were pursued to adoption (September 19, 1957) of the resolution in question. The resolution declares intent to proceed with the acquisition and construction of public water-supply facilities (featured by an intake leading from Lake Michigan through and to the component municipalities) at an estimated cost (this applies only to "the first stages of said ultimate project") of $10,923,000. It goes on to declare intent "To finance the initial cost of said project" by and through issuance of "general obligation bonds of the authority" in a sum not exceeding $10,930,000, "under and by virtue of the provisions of PA 1957, No 4."

The decisive question before us is whether:

(a) Looking at sections 16 and 18 of the act (the 2 sections respectively authorize levy *by the authority* of property taxes "to pay the principal and interest on the bonds maturing prior to the next tax collection period" and levy by the authority of property taxes to provide funds "for administration expenses of the authority and such other purposes of the authority as may be determined to be necessary"), and

(b) With thought concentrated on the sentence in section 16 reading "The tax for the purpose of paying the bonded indebtedness shall be unlimited as to rate or amount;" the act by granting such general taxing power to the authority violates article 10, § 21 (adopted in 1932 and amended in 1948), known as the

15-mill amendment of Michigan's Constitution (1908).

*First: Summary of opinion and legal background.*

Through and by means of an attritional series of judicial decisions the 15-mill amendment has been bruised, beaten and backed to the brink of sterile and forceless words. No intervening act of the electorate brought this about.[1] Bench law made of generated public necessity and pressured regression brings us this day to the last act and final scene. By the decree we are due to sign, this Constitutional restriction of the power of property taxation either will live on, probably in its present atrophied form, or perish forever. So far as concerns the power to limit "the total amount of taxes assessed against property for all purposes," the legislature—in event we sustain sections 16 and 18 of said Act No 4—will reign over the Constitution.

In the case before us, the defendant authority, proclaiming under Act No 4 that it is a "municipal corporation" within meaning of the last exception[2] set forth in the amendment and that it is armed with a "charter" which exempts it from effect of the amendment, moves now that this Court push the already battered amendment into the abyss where it may be destroyed by and at the will of the legislature.[3] We

[1] The 1948 amendment of said section 21 was solely enacted to enlarge the elective scope of the so-called first exception.

[2] In this opinion we shall refer to the phrase—"or when provided for by the charter of a municipal corporation"—as the "last" or "final" exception.

[3] E. Blythe Stason, then professor and now dean of the law school of the University of Michigan, writing presciently at the time (1933), foresaw employment of legislation to amend charters of municipal corporations as a means of getting around the limitation as applied to the taxable property of such municipal corporations. He did not, of course, foresee (any more than did the initiators and framers of the amendment) that new agencies, unknown at the time to the commonly-understood definition of a municipal corporation, would be set up by legislation dubbing them "municipal corporations" and providing them with chartered taxing power designed to evade the limitation. In "Fifteen Mill Tax Amendment and Its Effect," 31 Mich L

,cannot support the motion.   Our reasons are to fol-
low.

The amendment as adopted by the people in 1932
read this way:

"Sec. 21.   The total amount of taxes assessed
against property for all purposes in any one year
shall not exceed 1 and 1/2 per cent of the assessed
valuation of said property, except taxes levied for
the payment of interest and principal on obligations
heretofore incurred, which sums shall be separately
assessed in all cases; Provided, that this limitation
may be increased for a period of not to exceed 5 years
at any one time, to not more than a total of 5 per cent
of the assessed valuation, by a 2/3 vote of the electors
of any assessing district, or when provided for by the
charter of a municipal corporation; Provided fur-
ther, That this limitation shall not apply to taxes
levied in the year 1932."

In 1933 it was rewritten by the Court (*School Dis-
trict* v. *City of Pontiac,* 262 Mich 338) to read this
way (p 351 of report):

"The total amount of taxes assessed against prop-
erty for all purposes in any one year shall not ex-
ceed one and one-half per cent. of the assessed val-
uation of said property:  Provided, That this limita-

---

Rev 371, under subtopic "Amendment of Municipal Charters" (p
381), Dean Stason wrote:

"However, it will not be necessary for the legislature to shift the
entire burden to other sources if it takes advantage of the provision
contained in the fifteen-mill amendment authorizing an increase of
the limit from 15 to 50 mills.  The amendment provides that the limit
may be increased 'when provided for by the charter of a municipal
corporation.'  Probably nothing in the laws of the State of Michigan
prevents the State legislature from amending all of the municipal
charters in Michigan at any time it sees fit, and thus enabling munic-
ipalities to levy in excess of 15 mills to whatever extent may be
permitted by legislative act up to the ultimate limit of 50 mills.  The
legislature may do this with reference to all types of municipal cor-
porations existing in Michigan, including incorporated villages,
'fourth class' cities, special charter cities and home rule cities."

To the final sentence just quoted Dean Stason added the following
significant note:

"These are all the classes of municipal corporations that can exist
under the laws of Michigan."

tion may be increased for a period of not to exceed five years at any one time to not more than a total of five per cent. of the assessed valuation, by a two-thirds vote of the electors of any assessing district, or (that this limitation may be increased) when provided for by the (present or future) charter of a municipal corporation."

From the first parenthetical insertion shown in the quotation just made it will be noted that the final exception was thereby freed from the halter of the specified 50-mill limit (See Stason comment, quoted *supra*). The assault was on but not over. Next and in succession it was held that special assessments do not come within the scope and purpose of the all-inclusive and easily understood phrase: "The total amount of taxes assessed against property for all purposes" (*Graham* v. *City of Saginaw*, 317 Mich 427);[1] that the legislature could at will modify or amend the charters of municipal corporations, thus authorizing legislation enlarging or diminishing the taxing powers of such corporations without regard for the limitation (*Hazel Park* v. *Municipal Finance Commission*, 317 Mich 582; *Saginaw Council* v. *Saginaw Policemen and Firemen Retirement System Trustees*, 321 Mich 641); that charter townships are "municipal corporations" within the meaning of said final exception (*Charter Township of Warren* v. *Municipal Finance Commission*, 341 Mich 607); and finally that school districts are "municipal corporations" within meaning of such exception (*Hall* v. *Ira Township*, 348 Mich 402; *Kent County Board of Education* v. *Kent County Tax Allocation Board*, 350 Mich 327).[2] This case presents the close for the kill.

[1] In *Graham* (a chancery case) this holding was recorded *sua sponte*.
[2] We are not, in the present case, immediately concerned with the wisdom or legal soundness of any one or all of these amendment-eroding decisions. We *are* concerned, in this case of Bacon, lest errors of the past (if any) lead or force us into still greater error—that of authorizing final annihilation of the 15-mill amendment by legislative action.

Other decisions affecting scope of the amendment require no discussion because they do not relate to or premonish the final step defendant proposes; a holding that since the legislature stands free to set up governmental authorities or entities at will, it may—merely by calling each such authority or entity a "municipal corporation" and by providing in a legislative "charter" for each the power to tax property without regard for the 15-mill limitation—hand to each such authority or entity the power to utterly nullify the amendment within its charter-defined area.   To put it another way: If such lawfully may be done in the case of this Kent-Ottawa authority, so can it be done in the case of every like "authority" which, by legislative act, is now or hereafter assigned a public task.   Indeed, and for example: Should we pronounce lawful the power of property taxation as provided by said Act No 4, there is no reason why legislation declaring the Mackinac bridge authority a "municipal corporation," and providing it with a legislative "charter" authorizing levy by it—without limit as to rate or amount—of a State-wide property tax with which to pay its outstanding bonded indebtedness, cannot also be enacted without offense to the Constitution.   The illustration may be impertinent, yet it serves to show the lengths to which we are asked to go in this case of Bacon.

The amendment having been voted into the Constitution as an express limitation of the legislative as well as local power of taxation, it becomes our clear duty to protect whatever remains of the elector-intended right of property taxpayers (mostly home-owners) to say when and to what extent they are to pay more than the amendment-declared maximum millage amount.   This must be so unless by the interpretation presently sought we are obliged to hold that the final exception was intended to be construed as referring to any instrument or agency of govern-

ment which has been or will be organized and branded a "municipal corporation" by present or future act of the legislature. This brings us to the direct question of interpretation.

*Second: Interpretation of the constitutional exception—"When provided for by the charter of a municipal corporation"—as applied to Act No 4.*

As we shall see, our duty in exploring this question is to scrutinize the prevailing conditions and the "existing laws" which unitedly formed the circumstances under which this amendment of 1932 was conceived and voted into the Constitution. The burden of unrestricted property taxation had grown to the point of confiscation. The people were aroused and determined to restrict—permanently—the power of property taxation which then reposed generally in legislative( State and local) hands. Added to their tax troubles, the people were enduring a great and widespread economic depression, the devastating nature and effect of which we judicially notice.* With homes and farms everywhere threatened by sale for delinquent property taxes, and with the legislature failing to take decisive action in the direction of tax limitation, a desperate electorate took matters into its own lawful hands. As was so well said in early 1933 of the initiatory purpose (*School District* v. *City of Pontiac,* 262 Mich 338, 347, 348):

"Careful study of the amendment leads to these conclusions: Clearly the intent was to provide by the fundamental law of the State, which had not theretofore contained such provision, a general lim-

---

* *Roberts* v. *Michigan Trust Co.,* 273 Mich 91; *MacNear* v. *Malow,* 282 Mich 239; *Union Guardian Trust Co.* v. *Marquette Park Co.,* 300 Mich 89; *Alexandrine Hotel Co.* v. *Whaling,* 313 Mich 15. The situation was so bad that this Court, having granted mandamus to compel holding of the 1933 tax sale, withheld the writ "in view of existing emergency" (*Thompson* v. *Auditor General,* 261 Mich 624, 628).

itation upon the exercise of the taxing power of the State. The evil or abuse sought to be remedied was excessive taxation imposed by governmental agencies without the consent of those upon whom the burden was placed."

Of such economic conditions the 15-mill amendment of 1932 was conceived, initiated, supported and adopted. But what about the *existing law* defining "a municipal corporation," with respect to which the people presumptively determined to apply such final exception? Was it intended to include an "authority" which—a quarter century later—has been authorized or created by legislative act and dubbed, by legislative fiat, "a municipal corporation"? To speak plainly, an affirmative answer to this last question— if given—will automatically grant to the legislature the power of outright repeal of a duly-voted constitutional provision.

The presumption to which we refer is that the framers and electors meant this exception to be interpreted in accordance with existing laws and legal usages of the time, and also in accordance with common understanding of such existent laws and usages (see extended quotations and citations below). These general premises considered, grave questions loom. Did the people will that the expression "a municipal corporation" should be construed as meaning or referring to some entity or agency other than those already commonly known or recognized by "existing laws" as municipal corporations? Did they bother to resolve a statewide constitutional limitation upon the power of property taxation and, by the same instrument of resolution, mean to provide the legislature with power to nullify the limitation as applied to legislatively manufactured new types of "municipal corporations"? Are we to say that the

electors of 1932 planned to hand the existing or any future legislature the power and authority to undo, at will, that which became the essence of their resoundingly successful initiatory effort? For answer we turn first to our own cases. They are especially applicable (we have previously said so) to the very amendment now to be construed, the latter being "a wholly new and additional constitutional provision" (*School District* v. *City of Pontiac, supra*), aimed at a defined evil, and designed in specific rather than flexible terms.

In *School District* v. *City of Pontiac, supra,* we said this on approach to then invoked interpretation of the amendment:

"Fortunately the pertinent fundamental guides for such construction have been clearly and concisely stated in former decisions of this Court:

" 'It is a maxim that the object of construction, as applied to a written Constitution, is to ultimately ascertain and give effect to the intent of the people in adopting it. * * *

" 'In construing constitutional provisions where the meaning may be questioned, the Court should have regard to the circumstances leading to their adoption and the purpose sought to be accomplished.' *Kearney* v. *Board of State Auditors,* 189 Mich 666, 671, 673." (p 346 of report.)

In *Saginaw Council* v. *Saginaw Policemen and Firemen Retirement System Trustees,* 321 Mich 641, 647 (another case where this Court was called upon to construe the 15-mill amendment), the following appears:

"In *City of Detroit* v. *Chapin,* 108 Mich 136, 142 (37 LRA 391), we quoted with approval from *People, ex rel. Hughes,* v. *May,* 3 Mich 598, 610, the following:

· " 'The framers of a Constitution are presumed to have a knowledge of existing laws, * * * and to act in reference to that knowledge.'*

"And in *School District* v. *City of Pontiac, supra,* 348, we said:

" ' In drafting the amendment, as well as in its adoption, the people were mindful of existing conditions and sought to so frame the amendment as to be in accord with such existing conditions.'

"In 11 Am Jur, Constitutional Law, § 63, pp 676, 677, appears the following:

" ' A constitutional provision must be presumed to have been framed and adopted in the light and understanding of prior and existing laws and with reference to them.' "

And in *Attorney General* v. *Detroit Common Council,* 58 Mich 213, 216 (55 Am Rep 675), the interpretive rule was brought to bear directly upon the "essential character" of municipal corporations "as fixed by usage and recognition when the Constitution was adopted." There the Court, speaking through Mr. Justice Campbell, said:

"It is also well settled that our State polity recognizes and perpetuates local government through various classes of municipal bodies whose essential character must be respected, as fixed by usage and recognition when the Constitution was adopted. And any legislation, for any purpose, which disregards any of the fundamental and essential requisites of such bodies, has always been regarded as invalid and unconstitutional."

Under Michigan law, "as fixed by usage and recognition" when the amendment was adopted, incorpo-

---

* The complete quotation from *People, ex rel. Hughes,* v. *May* (quoted, in part, above )is more satisfactory and comprehensive. It reads (pp 610, 611 of report):

"Now the framers of a Constitution are presumed to have a knowledge of existing laws, and of their construction and the mode of their administration, and to act in reference to that knowledge as much as legislators are, and in this light we construe both constitutional and statutory law."

rated villages, fourth-class cities, special charter cities and home-rule cities were known as and commonly referred to as municipal corporations (see Stason, *ante,* pp 164, 165). To these and for the purposes of the amendment we have by case law added charter townships (*Charter Township of Warren* v. *Municipal Finance Commission,* 341 Mich 607) and— by virtue of the application of decisions long antedating 1932—school districts (*Hall* v. *Ira Township,* 348 Mich 402; *Kent County Board of Education* v. *Kent County Tax Allocation Board,* 350 Mich 327). Have we now reached the point of no return? Certainly one more operation will remove the last yard of entrails we have chosen to leave in the peritoneal cavity. This writer does not propose to operate and instead will defend the amendment against any such fatal judicial surgery.

Ruling Case Law, a standard and reliable general text of the nineteen-twenties and thirties, gives us this direct and relevant insight into the "existing laws" of the times (19 RCL, Municipal Corporations, § 3, p 691):

"Not every public corporation is a municipal corporation. 'Municipal,' it is true, has 2 meanings, one of which is 'pertaining to the internal government of a State or nation' and in that sense every corporation formed for governmental purposes is a municipal corporation. In its primary sense, however, 'municipal' means 'pertaining to a town or city or to its local government,' and it is in this sense that it is used in the phrase 'municipal corporation.'"

American Jurisprudence, the recognized successor of Ruling Case Law, pursues the definitional distinction in much the same language. We quote (37 Am Jur, Municipal Corporations, § 6, pp 623, 624):

"All municipal corporations are public bodies created for civil or political purposes; but all civil, political, public corporations are not, in the proper

use of language, municipal corporations.  A municipal corporation must be distinguished, on the one hand, from other governmental bodies which although municipal are not corporations, and, on the other hand, from corporations which although public are not municipal.  While the term 'municipal corporation' is sometimes used, in its broader meaning, to include such public bodies as the State and each of the governmental subdivisions of the State,—such as counties, parishes, townships, hundreds, et cetera, —it ordinarily applies only to cities, villages, and towns which are organized as full-fledged public corporations."

We hold on these sound premises that the defendant authority is not "a municipal corporation" within meaning, purpose, spirit, or intent of the 15-mill amendment.  It therefore must be ruled that said Act No 4, insofar as it authorizes levy by such authority of property taxes "unlimited as to rate or amount," is unconstitutional.  To such ruling, and for reference in like cases said to be coming here, we are constrained to append the following general thoughts upon the subject of evasion of the Constitution by subterfuge:

Appellants charge in their brief, without answer or denial by appellee, that the property tax sections of said Act No 4 constitute an unabashed scheme to defeat a constitutional limitation by political contrivance of unconstitutional nature.  We are forced to agree.  The act on its face—speaking as it does in terms of "unlimited" property taxation—flouts the constitutional tax limitation.  The defendant authority has conceded in so many words that said Act No 4 was "proposed to and adopted by the legislature" to enable the several involved townships (all of which were and now individually remain fettered by the 15-mill amendment) to levy property taxes without regard for the 15-mill limitation.  Such being the case,

those sections of the act which purport to authorize unlimited property taxation in these townships should receive short shrift here. McQuillin says (15 McQuillin, Municipal Corporations [3d ed], § 41.15, p 330):

"Attempts to evade debt-limitation provisions by subterfuge are universally frowned upon, and it has been said that 'arguments of convenience, of policy, or of present necessity, should not be allowed, by loose construction, to weaken the force or limit the extent' of such provisions."

This is a time of inflation and impatience with tax limitations, just as it was fourscore and seven years ago. At that time a like question confronted this Court. Artfully conceived legislation sought to end-run, without regard for constitutional sidelines, "several [constitutional] provisions expressly prohibiting the State from being a party to, or interested in, any work of internal improvement, or engaged in carrying on any such work, except in the expenditure of grants made to it; and also from subscribing to, or being interested in, the stock of any company, association or corporation, or loaning its credit in aid of any person, association or corporation."

In striking down such constitutionally offensive legislation, the purpose of which was much akin to that which we now scrutinize in the shape of said Act No 4, Mr. Justice COOLEY, speaking for us as well as for Justices CAMPBELL and CHRISTIANCY, laid down certain principles to which this Court again may— and should—declare its allegiance. We quote (*Bay City* v. *State Treasurer,* 23 Mich 499, 504, 505):

"All these provisions were incorporated by the people in the Constitution as precautions against injudicious action by themselves, if in another time of inflation and excitement they should be tempted to incur the like burdensome taxation in order to ac-

complish public improvements in cases where they were not content to wait the result of private enterprise. The people meant to erect such effectual barriers that if the temptation should return, the means of inflicting the like injury upon the credit, reputation and prosperity of the State should not be within the reach of the authorities. They believed these clauses of the Constitution accomplished this purpose perfectly; and none of its provisions had more influence in recommending that instrument to the hearty good will of the people.

"In process of time, however, a majority in the legislature were found willing, against the solemn warning of the executive, to resort again to the power of taxation in aid of internal improvement. It was discovered that though 'the State' was expressly inhibited from giving such aid in any form, except in the disposition of grants made to it, the subdivisions of which the State was composed were not under the like ban. Decisions in other States were found which were supposed to sanction the doctrine that, under such circumstances, the State might do indirectly through its subdivisions what directly it was forbidden to do. Thus a way was opened by which the whole purpose of the constitutional provisions quoted might be defeated. The State could not aid a private corporation with its credit, but it might require each of its townships, cities and villages to do so. The State could not load down its people with taxes for the construction of a public improvement, but it might compel the municipal authorities, which were its mere creatures, and which held their whole authority and their whole life at its will, to enforce such taxes. one by one, until the whole people were bent to the burden."

Having recorded these great principles, all of which are directly applicable to legislation which has been conceived of a purpose to evade constitutional limitations, our learned predecessor went on to say (p 506 of report):

"Constitutions do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and it cannot be permissible to the courts that in order to aid evasions and circumventions, they shall subject these instruments, which in the main only undertake to lay down broad general principles, to a literal and technical construction, as if they were great public enemies standing in the way of progress, and the duty of every good citizen was to get around their provisions whenever practicable, and give them a damaging thrust whenever convenient. They must construe them as the people did in their adoption, if the means of arriving at that construction are within their power."

A case presenting the same question and the same arguments of necessity as have come to us here is *Rappaport v. Department of Public Health of Indianapolis,* 227 Ind 508, 519–521 (87 NE2d 77). The court said, and we adopt these views:

"To shift a governmental function from an old governmental unit to a new one in the same area in effect would, to the extent of indebtedness incurred by the new unit, in connection with the exercise of such function, enlarge the debt limit within which the exercise of the function had been financed. This has been done by the statute under consideration. With this in mind, and with the further fact in mind, that substantial control remains in the city, with only a little change in mechanics, we are almost compelled to think that the change was made for the purpose of circumventing the constitutional debt limitation, and, even though made with the best of motives, it transgresses our fundamental law. If within our constitution, as it is, we cannot finance necessary hospital additions and improvements then we should amend the constitution, not flout it.  *  *  *

"We may look only to the effect and result, and, if the new legislation, however desirable, appears to be

a device which in fact serves to circumvent the constitutional debt limitation provision, we have no choice but to condemn it. Paraphrasing the words of Judge Elliott, in the case of *Town of Winamac* v. *Huddleston* (1892), 132 Ind 217, at page 218 (31 NE 561, 562), we may regret that the bonds to build additions to and improvements in the Indianapolis City Hospital may not be issued 'but we cannot escape the force of the strong and plain provisions of our organic law.' "

## *Summary.*

We do not question the power of the legislature to call any commission, board, bureau, authority, entity, or tribunal, to which some public or municipal duty. or job has been committed or assigned, "a municipal corporation." We do deny legislative power to circumvent the 15-mill amendment by calling any legislative creature "a municipal corporation" when that creature would not, in 1932, have been properly classed as " a municipal corporation."

An affirmance here would give our judicial blessing to an incestuous marriage of various local units of government, at least 3 of which are tax-inhibited by the Constitution, for the purpose of bringing forth an illegitimate property-tax offspring already named—by the willing and midwifing legislature— "a municipal corporation." By such a semantic device we are asked to endow the gargantuan child with "unlimited" powers of property taxation some, if not all, of the multiple parents do not enjoy. It should be clear that we cannot do this, and that an appropriate summary of the case may easily be made by paraphrasing as, follows, the concluding paragraph of *Saginaw Council* v. *Saginaw Policemen and Firemen Retirement System Trustees, supra* (pp 647, 648):

It must be assumed that the people, in adopting a constitutional amendment providing for a 15-mill tax limitation which might be increased by charter provision of a municipal corporation, were conversant with and had in mind the fact that it then was the established law in Michigan that cities and villages and, at most, school districts, were the only units of government which were known and classed as "municipal corporations," and that an excepting phrase worded; "or when provided for by the charter of a municipal corporation," would be faithfully gauged and applied by this Court according to such established law.

This squares with the horizon-clear view our Court —then "on location"—was given of the amendment as it passed through the elective and judicial process in 1932–1933. In *School District* v. *City of Pontiac,* *supra* (pp 352, 353), discussion of the mentioned final exception was concluded this way:

"In passing, it may also be stated we think there is much force in the argument set forth in the brief for the city of Pontiac that in the framing and adoption of this amendment there was in contemplation the fact that, outside of chartered cities, there was no general limitation upon the exercise of the power of taxation; and that in assessment districts other than cities the limitation in the amendment should be applied unless otherwise determined by the requisite vote of the electors; but that in cities having a charter provision action of this character had already been taken by the local electors in adopting their various city charters, and therefore the action so taken should be respected by excepting such districts from the general limitation of 1-1/2% embodied in the amendment insofar as the power of taxation was exercised for the city's local needs."

Our declared holding obviates necessity for consideration of another grave question, whether said Act

No 4 (gazing particularly at section 19 thereof) violates the uniformity clause (Const 1908, art 10, § 3).

The chancellor's decree is reversed and the case is remanded for entry of a new decree declaring that sections 16 and 18, PA 1957, No 4, are unconstitutional. No costs.

SMITH, VOELKER, and KAVANAGH, JJ., concurred with BLACK, J.

DETHMERS, C. J., and CARR and KELLY, JJ., concurred in the result.

EDWARDS, J. (*concurring*). For reasons ably stated in Mr. Justice BLACK's opinion, I concur that section 16, PA 1957, No 4* represents a patent evasion of both the language and purpose of section 21, article 10, of the Constitution (1908). I feel, however, that the opinion places too much emphasis upon interpreting constitutional language as of the time of its adoption. "In the application of a constitution, * * * our contemplation cannot be only of what has been but of what may be." *Weems* v. *United States,* 217 US 349, 373 (30 S Ct 544, 54 L ed 793, 19 Ann Cas 705).

---

* CL 1948, § 121.16 (Stat Ann 1958 Rev § 5.2533[46]).—REPORTER.